[No. F012459. Fifth Dist. Jan. 10, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
ROGER CONNELLY OWEN, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III.

**COUNSEL**

Howard J. Specter, under appointment by the Court of Appeal, for Defendant and Appellant.

Edward W. Hunt, District Attorney, and Kenneth Hahus, Deputy District Attorney, for Plaintiff and Respondent.

**OPINION**

**BEST, P. J.—**

### STATEMENT OF THE CASE

Roger Connelly Owen appeals from the judgment on a jury verdict convicting him of involuntary manslaughter (Pen. Code, § 192, subd. (b)),[1] a lesser included offense of murder, for the shooting death of Danny Yoakum. The court denied probation and sentenced him to the mitigated term of two years plus two years for the gun use (§ 12022.5, subd. (a)), and imposed a $10,000 fine. Defendant raises two novel issues: (1) did the court have a sua sponte duty to instruct on the presumption contained in section 198.5 that defendant had a reasonable fear of death or great bodily injury, and (2) was defense counsel incompetent for failing to request such an instruction? We conclude the jury was instructed adequately on the principle embodied in section 198.5 by the other instructions given; thus, there was no sua sponte duty to instruct nor was counsel incompetent for failing to request such an instruction.

### STATEMENT OF FACTS

On February 18, 1989, the day of the shooting, defendant lived with his girlfriend Connie Carlstrom at 4624 North Hughes Street in Fresno. In

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

1987 and 1988, Danny Yoakum, his father Marshall Yoakum, and a man named Jeff lived in the house with defendant and Connie. Danny moved out of the house in January 1988. Marshall and Jeff moved out in June 1988. The men left a number of things behind including a dryer which belonged to Danny and a bookcase which belonged to Marshall.

Marshall, Danny, Connie and defendant had worked together at The Source, a motorcycle novelty items distributing warehouse. Marshall managed the business and Danny worked there at the time of his death. Connie had quit the company a week before the shooting and defendant had quit on friendly terms in November 1987 because he needed more income.

Defendant and Danny had argued occasionally. Defendant had been instrumental in convincing Marshall to ask Danny to move out of the house because Danny frequently brought home strangers he met at motorcycle shows. Defendant and Danny also had some business management type disagreements about The Source.

On February 18, in the early afternoon, Danny arrived unannounced at the Hughes Street residence and said he wanted to retrieve his belongings. Defendant helped him load a table and chair into his van. Danny walked through the house looking for other items. The visit lasted about five minutes and defendant and Danny seemed to get along. Danny asked if he could return later to get his dryer and Connie said that was fine.

Later that evening, Danny returned for the dryer accompanied by Albert "Bert" Logsdon. Defendant had never seen Bert before but Connie had seen him several times at The Source where he was newly employed. When the men retrieved the dryer from the garage, Danny looked around as if he were looking for more items that belonged to him. Danny and Bert took the dryer to Danny's apartment. Danny said he wanted to go back and talk to defendant about some items he had seen at the house. Danny returned to the Hughes residence with Bert. He asked Bert to wait in the car because he did not want to embarrass defendant in front of Bert. As Danny was walking up to the door, Bert told him jokingly to yell if he needed backup.

About 10 minutes after Danny left with the dryer, defendant answered Danny's knock at the door. Danny said, "I want my stuff," and screamed that he wanted Marshall's bookcase. Defendant told him nothing else at the house was his and attempted to close the door. The remaining items left at the house belonged to Marshall. Marshall had not told defendant to let Danny have anything nor had he told Danny he could have the bookcase. Danny stuck his foot in the door to prevent defendant from closing it and punched it open with his fist. Danny approached defendant kicking and

punching. His eyes were wide, his face "enraged." Defendant tried to defend himself by kicking and punching back.

From the van, Bert saw Danny making punching motions and joined him at the doorway. Defendant was standing inside the doorway. Bert grabbed defendant by the arms and pushed him back in an attempt to stop the fight. Danny said to let defendant go, so Bert released him and backed off behind Danny. Defendant and Danny started to fight again. Danny forced defendant back into the kitchen adjacent to the entryway.

Bert assessed the fight as pretty even. Danny was approximately 6 feet tall and weighed about 200 pounds. Defendant was 5 feet, 10 inches tall and weighed about 185 pounds. Bert was 6 feet tall and weighed 180 pounds.

According to Bert, the men stopped fighting periodically and yelled at each other, then commenced fighting again. Defendant tried to pull something from his pocket. Bert thought he was going for a weapon and told him to stop. Danny and defendant fought into the living room which was on the opposite side of the entryway from the kitchen. Defendant pulled a pocket knife from his belt. Bert told him to put it away or he would "get involved." Defendant returned the knife and left the room. Bert tried to get Danny to leave but Danny began to yell at Connie. Twenty to thirty seconds later, Danny turned around and was headed out the front door. Defendant walked quickly through the kitchen holding a gun pointed toward the floor. He brought the gun up, said something like "take this" and from a distance of two to four feet fired one shot at Danny. Danny dropped at the threshold of the door. His legs from the knees down were inside the house; the rest of his body lay prone on the front doorstep. Defendant asked, "what happened" and put the gun on the kitchen counter. Bert told Connie to call an ambulance.

According to Connie, when defendant answered the door, Danny began to shout at him. She went to the kitchen to see what was going on and observed Danny beating and clawing at defendant while defendant tried to push him off. She yelled at Danny to stop. Danny had hold of defendant's shirt and was punching him and forcing him back through the kitchen. Danny said defendant had thrown him out of the house and he wanted his father's bookcase back. Defendant said he would talk to Marshall in the morning and Danny should leave. Danny seemed to be getting the better of the fight. All of a sudden, defendant was gone and Connie was facing Danny. Danny yelled that she had cheated his company, lied to him and stole from him. He was enraged; his eyes were huge and his face was gray. Connie was frightened of Danny because he would not stop fighting and leave; however, Danny did not attempt to grab or strike her. She turned to

her left and saw defendant holding a gun pointed up in the air. She turned to go to the phone and heard a shot. Defendant said, "I'm sorry, this wasn't supposed to happen." Bert said, "Danny's dying, call an ambulance." Before that evening, Connie knew Danny could be verbally abusive but she had never seen him hit or attack anyone.

According to defendant, when Danny forced his way into the house, Bert came in and grabbed him. When Bert released him, Danny began to attack again and forced defendant back into the kitchen. Bert approached again, hit defendant on the shoulder and told him to back off. Danny continued to scream and to demand the bookcase. Connie told him to take anything he wanted, but then to leave. Defendant told Danny to leave and told Bert to get Danny out of there. Danny responded by punching and kicking him. Defendant reached for his work knife which he had in a sheath on the back of his belt. He could not get at it because he had to keep blocking blows.

Defendant felt Danny was winning the fight. He never got knocked off his feet, but Danny was landing many blows on his head and neck. Defendant pushed Danny back. Danny looked over at Connie and started screaming at her. While Danny's attention was on Connie, defendant planned to come behind him, grab him and yank him out the door. Bert blocked his way, however, so he reached for his knife. Bert told him if he pulled the knife, Bert would get involved. Defendant assumed Bert had a bigger knife and knew how to use it.

Defendant retrieved his gun from a footlocker in the den. He planned to use it as a bludgeon. Danny was by the front door talking to Bert. Defendant walked back through the kitchen holding the gun straight up in the air. He reached across and hit Danny in the head/neck area. Danny fell and the gun went off at the same time. Defendant asked, "what happened?" He was shocked and put the gun on the kitchen counter. Defendant felt he had to use the gun because Danny and Bert would not leave and were threatening Connie and him. Defendant was upset and afraid and knew no other way to stop them. He did not intend to kill Danny.

When officers arrived at the scene about 8 p.m., Danny was lying prone in the doorway. His knees and ankles were inside the house, the rest of his body was outside. Defendant looked as if he had been in an altercation. His shirt was torn, he had a one-inch scratch on his right hand and several scratches near his right elbow. He did not appear to have any facial injuries. Tests disclosed that neither Danny nor defendant had any drugs or alcohol in his blood.

Danny died from a gunshot wound to the back of the head two inches below the base of the skull. The bullet traveled upwards in a 60- to 70-

degree trajectory while Danny's head was turned 30 degrees to the left. The barrel of the gun was one to six inches from the surface of Danny's jacket when it was fired. The pathologist who conducted the autopsy believed the bruising at the back of the victim's head and shoulders was not caused by a blow from the butt of a gun. A ballistics expert testified defendant's gun had a normal trigger pull.

## DISCUSSION

### I. DID THE COURT HAVE A SUA SPONTE DUTY TO INSTRUCT ON SECTION 198.5'S PRESUMPTION THAT DEFENDANT HAD A REASONABLE FEAR OF DEATH OR GREAT BODILY INJURY?

#### A. *Does section 198.5 apply in this case?*

Section 198.5, enacted in 1984 and entitled "the Home Protection Bill of Rights," provides:

"Any person using force intended or likely to cause death or great bodily injury within his or her residence shall be presumed to have held a reasonable fear of imminent peril of death or great bodily injury to self, family, or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully or forcibly entered the residence and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred.

"As used in this section, great bodily injury means a significant or substantial physical injury."

The People contend section 198.5 does not apply in this case for two reasons. First, defendant is not the type of individual the statute was intended to protect: a resident in his home confronted by an unknown burglar, robber or trespasser. Second, defendant did not use force likely to cause death or great bodily injury when he employed the gun as a bludgeon. The People are mistaken in both regards.

Where the language of a statute is clear and unambiguous, courts should not attempt to construe it but should follow its plain meaning. (*People* v. *Cherry* (1989) 209 Cal.App.3d 1131, 1134 [257 Cal.Rptr. 684].) On its face the statute applies. Defendant's testimony was that the victim, who was not a member of the family or household, forced his way into defendant's residence for an unlawful purpose—to take property that did not belong to him. In response, an altercation occurred and defendant

hit the victim/intruder on the back of the head with a loaded gun which discharged and killed the victim. The statute does not require the intruder to be a stranger to the resident; he or she need only be a nonmember of the family or household who unlawfully or forcefully enters the residence. Further, the court acknowledged in *People* v. *Tophia* (1959) 167 Cal.App.2d 39 at page 45 [334 P.2d 133] that the defendant employed "deadly force" when he used the butt of a loaded revolver to hit his assailant on the side of the head. Thus, the jury could have found that the victim met the statutory prerequisites and that defendant used the specified degree of force for the statute to apply.

### B. *Did the court have a sua sponte duty to instruct on the statutory presumption?*

Defendant contends the trial court had a sua sponte duty to instruct the jury with section 198.5's presumption that he had a reasonable fear of imminent peril of death or great bodily injury when he killed the victim. Defense counsel, who was unaware of the statute at trial, moved for a new trial on the ground the jury was instructed improperly on a critical issue because no instruction based on section 198.5 was given. The trial court denied the motion reasoning that the effect of section 198.5 was to create a presumption that defendant, by having a reasonable fear of death or great bodily injury, acted properly in self-defense or defense of another. Thus, the statute placed on the People the burden to prove beyond a reasonable doubt that defendant did not have a reasonable fear. That presumption and the People's concomitant burden of proof was already before the jury by virtue of the other instructions given. We agree.

In criminal cases, the trial court must instruct sua sponte on the general principles of law relevant to issues raised by the evidence. The general principles of law governing the case are those principles closely and openly connected with the evidence which are necessary for the jury's proper consideration of the case. At a minimum, the court must ensure that the jury is adequately instructed on the law governing all elements of the case submitted to it to the extent necessary for a proper determination in conformity with applicable law. (*People* v. *Iverson* (1972) 26 Cal.App.3d 598, 604-605 [102 Cal.Rptr. 913].)

The rule is designed to promote the ends of justice by providing some judicial safeguards for defendants from the possible vagaries of inept counsel under the adversary system. However, the trial court cannot be required to anticipate every possible theory that may fit the facts of the case before it and instruct the jury accordingly. (*People* v. *Wade* (1959) 53 Cal.2d 322, 334 [1 Cal.Rptr. 683, 348 P.2d 116].) Thus, the court is required to instruct

sua sponte only on general principles which are necessary for the jury's understanding of the case. It need not instruct on specific points or special theories which might be applicable to a particular case, absent a request for such an instruction. (*People* v. *Warren* (1940) 16 Cal.2d 103, 116-117 [104 P.2d 1024].)

 In this case, the court had no sua sponte duty to give an instruction based on section 198.5 because the jury was adequately instructed on the law pertinent to the facts of the case, including that encompassed in section 198.5, by the instructions given.

Section 198.5 creates the rebuttable presumption that defendant had a reasonable fear of death or great bodily injury when he used deadly force against the victim. (Evid. Code, §§ 601, 620.) Rebuttable presumptions affect either the burden of producing evidence or the burden of proof. (Evid. Code, § 601.) A presumption that operates to facilitate the determination of a particular action affects the burden of producing evidence (Evid. Code, § 603); a presumption established to implement some public policy is a presumption affecting the burden of proof. (Evid. Code, § 605.) The legislative history of section 198.5 indicates the statute was enacted to permit residential occupants to defend themselves from intruders without fear of legal repercussions, to give "the benefit of the doubt in such cases to the resident, establishing a presumption that the very act of forcible entry entails a threat to the life and limb of the homeowner." (Press Release from the office of Sen. H. L. Richardson (the bill's author) Oct. 1, 1984.) Thus, the presumption in section 198.5 was implemented to promote a public policy and affects the burden of proof.

 The effect of the presumption is to impose upon the People the burden of proof as to the nonexistence of the presumed fact. (Evid. Code, § 606.) The burden, therefore, was on the People to prove beyond a reasonable doubt that defendant did not have a reasonable fear of imminent peril of death or injury to himself or to Connie when he killed the victim. (§ 1096; Evid. Code, § 501.) However, this burden already rested upon the prosecution independently of the presumption created by section 198.5— and the jury was so instructed in the instant case.

The jury was instructed on the People's burden of proof in this regard by CALJIC Nos. 2.90, "This presumption [of innocence] places upon the People the burden of proving him guilty beyond a reasonable doubt"; 8.72, "If you are satisfied beyond a reasonable doubt that the killing was unlawful . . ."; 8.10, "A killing is unlawful if it was neither justifiable or excusable"; and 5.15, "Upon a trial of a charge of murder, a killing is lawful if it was justifiable or excusable. The burden is on the prosecution to prove beyond a

reasonable doubt that the homicide was unlawful, that is, not justifiable or excusable. If you have a reasonable doubt that the homicide was unlawful, you must find the defendant not guilty."

In addition, the jury was instructed on lawful homicides: excusable or justifiable (CALJIC No. 8.00); in the heat of passion (CALJIC No. 5.01); by accident (CALJIC No. 5.00); in self-defense (CALJIC Nos. 5.12, 5.13); and to resist a forcible or atrocious crime (CALJIC No. 5.10).

The jury was also instructed that a person may use all force reasonably necessary to defend himself against an assault (CALJIC No. 5.30); an occupant may use reasonable force to eject a trespasser (CALJIC No. 5.40); and a person may defend his home against anyone who endeavors in a violent or riotous manner to enter the home and who appears to intend violence to any person in the home. The occupant may resist force with force and may increase his force in proportion to the intruder's persistence and violence (CALJIC No. 5.42).

Dependent upon its determination of the facts, the jury could have found defendant guilty of second degree murder, voluntary manslaughter or involuntary manslaughter. If the jury believed Bert's testimony that defendant aimed at and shot the victim in the back of the head as he was leaving the house, defendant was guilty of second degree murder. If the jury believed Bert's testimony but found defendant's heat of passion or imperfect self-defense negated malice, defendant was guilty of voluntary manslaughter. Finally, if the jury believed defendant did not intend to kill the victim but the killing occurred while defendant was committing a misdemeanor inherently dangerous to human life (unlawful exhibition of a firearm, § 417, subd. (a) (2)), or was doing a lawful act which involved a high degree of risk of death or great bodily harm, without due care (ejecting a trespasser by striking him on the head with a loaded gun while his finger was on the trigger), defendant was guilty of involuntary manslaughter. Under defendant's theory of the case, the killing was accidental; the victim/trespasser was killed because defendant reasonably believed he had to incapacitate the victim by using his gun as a bludgeon to defend himself and Connie from the victim's assault and the gun discharged accidentally as defendant struck the victim.

A review of the record indicates the court fully and fairly instructed the jury on the law pertinent to the facts of the case under all the theories presented. Had counsel requested an instruction embodying section 198.5's presumption, such an instruction should have been given. Section 198.5 emphasizes the fact that defendant's residence has been violated when evaluating the defendant's state of mind when he used force against the

intruder. A defendant, upon proper request, has a right to an instruction that relates the reasonable doubt standard for proof of guilt to particular elements of the crime charged. (*People* v. *Sears* (1970) 2 Cal.3d 180, 190 [84 Cal.Rptr. 711, 465 P.2d 847]; *People* v. *Adrian* (1982) 135 Cal.App.3d 335, 337 [185 Cal.Rptr. 506].) However, since the jury was instructed with all principles of law necessary for its understanding of the case, the court had no duty to instruct on the presumption of section 198.5 absent a request for such an instruction. (*People* v. *Cayer* (1951) 102 Cal.App.2d 643, 653 [228 P.2d 70].)

## II

### The Ineffective-assistance-of-counsel Claim Must Fail.

■ To establish entitlement to relief for ineffective assistance of counsel the burden is on the defendant to show (1) trial counsel failed to act in the manner to be expected of reasonably competent attorneys acting as diligent advocates, and (2) it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings. (*People* v. *Lewis* (1990) 50 Cal.3d 262, 288 [266 Cal.Rptr. 834, 786 P.2d 892].)

Even if a reasonably competent attorney should have requested an instruction based on section 198.5 and counsel's failure to request the instruction constituted ineffective assistance, defendant's claim must fail because he cannot show prejudice. While defendant has not suggested an applicable instruction based on section 198.5, the heart of such an instruction would advise the jurors that if they found (1) that the victim was not a member of defendant's residence or household, (2) that the victim unlawfully and forcibly entered the defendant's residence, and (3) that the defendant used force intended or likely to cause death or great bodily injury against the victim within the residence, then, unless the prosecution proves beyond a reasonable doubt that the defendant did not hold such fear at such time, the jury must find the defendant had a reasonable fear of imminent peril of death or great bodily injury to himself or to a member of his family or of his household at the time he used such force.

As pointed out above, the jury was instructed with the legal principles that would have been included in such an instruction had it been requested and given. The court instructed: "The burden is on the prosecution to prove beyond a reasonable doubt that the homicide was unlawful, that is, not justifiable or excusable. If you have a reasonable doubt that the homicide was unlawful, you must find the defendant not guilty." The jury was then instructed on lawful homicides: excusable or justifiable, in the heat of passion, by accident, in self-defense, and to resist a forcible or atrocious crime.

In addition, other instructions highlighted defendant's legal right to defend himself and his home from trespassers and others who violently enter his home. Thus, defendant received the benefit of section 198.5's presumption by other instructions given to the jury and it is not reasonably probable a more favorable determination would have resulted had counsel requested an instruction based on section 198.5.

### III

### DID THE COURT ABUSE ITS DISCRETION IN DENYING PROBATION?*

· · · · · · · · · · · · · · · · · · · · · ·

### DISPOSITION

The judgment is affirmed.

Dibiaso, J., and Brown, (G. A.), J.,† concurred.

Appellant's petition for review by the Supreme Court was denied March 21, 1991.

---

*See footnote, *ante,* page 996.

†Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.