[No. G018175. Fourth Dist., Div. Three. Oct. 31, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
LONNIE RAY SILVEY, Defendant and Appellant.

## COUNSEL

Ellen M. Matsumoto and Stephen Gilbert, under appointments by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Keith I. Motley and Meagan J. Beale, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BEDSWORTH, J.**—Lonnie Ray Silvey appeals his conviction for voluntary manslaughter, contending: (1) The evidence established self-defense as a matter of law; (2) the trial court erroneously failed to instruct the jury sua sponte that Silvey was presumed to have feared the infliction of death or great bodily injury; and (3) trial counsel was incompetent for having neglected to request such an instruction. We affirm.

Pamela Corry lived for about four years with her boyfriend, Rodney Robinson, in her mobilehome. Robinson was a small man, about 130 pounds. He was a heavy drinker and verbally abusive, but she testified he had never been violent. In July 1994, Corry and Robinson broke up, but since Robinson had little money and no place to go, Corry let him continue living in her trailer with her and her sister.

In less than a month, the relationship deteriorated and Robinson's angry outbursts resulted in property damage and an attempt to slap Corry's sister. Finally, in a scene familiar to every devotee of bad drama, Corry demanded Robinson return her key, they hugged, cried, and Robinson left, but not before trying to pick a fight with Corry's friend Lonnie Ray Silvey.

Silvey was an occasional guest at the Corry trailer and had been given a key. He lived in a small room at his worksite, and, since it did not provide shower facilities, Corry allowed him to shower once a day at her trailer and occasionally sleep over if he worked late. Thus he and Robinson had known

each other for years, and he was surprised when Robinson shoved him, yelled at him, and rather cryptically accused him of talking about Robinson to Corry's friends. He was not, however, frightened by it.

The next evening, Corry went to a bar to compete in a dart tournament. Having just thrown her usual partner, Robinson, out of her life, she asked Silvey to accompany her and be her partner if necessary. Robinson competed against her in the tournament and became increasingly nasty to her as the evening progressed, he drank, and she won. When she tried to leave, Robinson grabbed her by the arms and neck, which hurt and upset her. A few minutes later, Robinson found her and Silvey at another bar and "flipped [them] off" before leaving.

The next night, around 9:20 p.m., Silvey was at Corry's trailer, drinking and playing dice, when Robinson arrived. He was very drunk (his blood-alcohol level was .34) and began banging on the door, even though it was open and he could have walked through. When Corry went to the door, he insisted on finding out "what boyfriend" she had over, and refused to believe her when she said no one was there but Silvey. He told her to "Move out of the way, bitch," and pushed past her into the trailer.

Finding Silvey seated on the couch, he resurrected the previous night's imbroglio, blaming Silvey for the fact his life was "falling apart," and punctuating his words by poking Silvey in the chest. After about two minutes, Silvey said, "We don't have to put up with this anymore. Just call 911 and just ask them to come and help get him out." Corry questioned whether this was really necessary, but Silvey repeated his urging and she complied.

While she was doing so, Silvey pulled a gun. Apparently he had secreted it under the couch without Corry's knowledge and against her wishes. He pointed the gun at Robinson and ordered him to go. Instead, Robinson slid across the couch and lunged at him, trying to get the gun. He held Robinson off with his foot, continuing to point the gun at him and ordering him to back off, but the drunken Robinson was unimpressed. He urged Silvey to use the gun, saying he wanted to die.[1]

Tragically, albeit not surprisingly, those were Robinson's last words. Silvey shot him. Five times. Robinson died from four chest wounds and one to the forehead. The shots were fired from at least two feet away, although Corry testified Robinson was six inches to a foot from Silvey when he was shot.

---

[1] At trial, Corry testified Robinson also said if he got the gun from Silvey he would shoot him, but it was established she never told the police that when she spoke with them.

I

Silvey contends the evidence established self-defense as a matter of law. Although this could be viewed as a close case, we disagree.

When the sufficiency of the evidence is challenged, the court is not required to " ' "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation.] Instead the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]" (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

"In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court 'must . . . presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citations.] The court does not, however, limit its review to the evidence favorable to the respondent. . . . '[O]ur task . . . is twofold. First, we must resolve the issue in the light of the *whole record*—i.e., the entire picture of the defendant put before the jury—and may not limit our appraisal to isolated bits of evidence selected by the respondent. Second, we must judge whether the evidence of each of the essential elements . . . is *substantial*; it is not enough for the respondent simply to point to "some" evidence supporting the finding, for "Not every surface conflict of evidence remains substantial in the light of other facts." ' [Citation.]" (*People* v. *Johnson, supra*, 26 Cal.3d at pp. 576-577.)

Silvey extends an invitation to decide the sufficiency of evidence as a matter of law, relying on *People* v. *Louis* (1986) 42 Cal.3d 969 [232 Cal.Rptr. 110, 728 P.2d 180] and reasoning that because the facts were essentially undisputed, we should make the determination of reasonableness as a matter of law. *Louis* is inapposite as it did not deal with sufficiency of the evidence, and the Supreme Court has not indicated the case affects the sufficiency of evidence analysis as we have set it out. In any event, reasonableness, at least in the context of self-defense, is " 'an inquiry that is "essentially factual," [citation]—one that is founded "on the application of the fact-finding tribunal's experience with the mainsprings of human conduct" . . . .' " (*People* v. *Louis, supra*, 42 Cal.3d at p. 987.) As such it should be reviewed under the "clearly erroneous" standard (*ibid.*), which is not unlike the standard set forth in *People* v. *Johnson, supra*, 26 Cal.3d 557.

Using that standard, we conclude substantial evidence supported the verdict. Even if we were to assume Silvey bore Robinson no ill will from

Robinson's prior abuse or his conduct just before the shooting, and that Silvey acted out of an actual fear for his life, a rational jury could still find Silvey acted unreasonably. Although Robinson barged into the trailer against Corry's wishes, and was drunk and verbally abusive, he had not harmed or threatened to harm Corry or Silvey, both of whom had known him through years of essential nonviolence. A jury could certainly conclude Silvey had no need to pull the gun and acted unreasonably in doing so. The jury could also conclude that even after Silvey took out the gun, he had no need to use it.

Even if we thought we might have reached a different verdict, we would not be prepared to substitute our judgment for the jury's. Although a reasonable jury could have concluded Robinson appeared ready to take the gun and use it on Silvey, an equally reasonable conclusion is that it was only drunken bravado. The circumstances of this incident are undeniably tragic, but they do not justify usurping the fact-finding prerogatives of the jury.

## II

 Silvey urges that "the trial court erroneously failed to instruct the jury that the use of deadly force by a resident against an intruder is presumed to be reasonable." He contends such an instruction is supported by Penal Code section 198.5, and should have been given even though it was not requested. The problem with this argument is that it was never suggested Silvey was a resident.

California law declares to be justifiable, homicide committed in reasonable defense of habitation (Pen. Code, § 197; *People* v. *Gleghorn* (1987) 193 Cal.App.3d 196, 200 [238 Cal.Rptr. 82]), but it extends the presumption of "a reasonable fear of imminent peril of death or great bodily injury" only to residents (Pen. Code, § 198.5). This makes sense. It is a judgment rooted in our veneration of home and our recognition that the resident is in the best position to assess an ostensible threat to the home, consider any extenuating circumstances, and determine what response is necessary.

Therefore, Penal Code section 198.5 creates a rebuttable presumption that anyone who employs deadly force against an intruder "*within his residence*" has done so in reasonable fear of imminent peril of death or great bodily injury.[2] By its terms, the presumption benefits only *residents* defending their homes. Whatever might now be said about Silvey's status as a resident, it was not clear enough at trial to merit this instruction sua sponte.

---

[2]Penal Code section 198.5 provides: "Any person using force intended or likely to cause death or great bodily injury within his or her residence shall be presumed to have held a reasonable fear of imminent peril of death or great bodily injury to self, family, or a member

■ The trial court has a sua sponte obligation to instruct the jury on general principles of law relevant to the issues of the case. (*People* v. *Hood* (1969) 1 Cal.3d 444, 449 [82 Cal.Rptr. 618, 462 P.2d 370].) These are usually described as those which are "commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case. [Citations]." (*People* v. *Montoya* (1994) 7 Cal.4th 1027, 1047 [31 Cal.Rptr.2d 128, 874 P.2d 903].) Penal Code section 198.5 was not a principle of law which can be so described.

■ Silvey was never shown to be, nor did he ever claim to be, a resident. According to Corry, Silvey lived in a small room at his worksite which had no shower facilities, and she ". . . told him he could come over once a day and take a shower. And then on occasion, when he came home really late at night, I told him it was okay for him to sleep on the couch."[3] This certainly does not sound like any kind of residency the law has previously recognized, and we can discern no indication the Legislature wanted to extend the protection of the presumption to guests.[4]

Indeed, it is difficult to imagine a case which more clearly illustrates the wisdom of the legislative decision to apply the statute only to residents. The resident here, Corry, had lived with Robinson four years and had never known him so much as to get into a fistfight. When urged to call the police to deal with his conduct, she hesitated and expressed doubt even that was necessary. Clearly, she was in the best position to assess any threat to her home, and she was reluctant to take any action, much less authorize danger-ous or deadly force.

Silvey, however, had apparently secreted a gun in Corry's trailer, without her consent and against her wishes. He resorted to this after only two

---

of the household when that force is used against another person, not a member of the family or household, who . . . has unlawfully and forcibly entered the residence and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred.

"As used in this section, great bodily injury means a significant or substantial physical injury."

[3]When asked who had *lived* at the mobilehome other than she and Robinson, Corry named only her sister and occasional out-of-town guests. In arguing CALJIC No. 5.40 (right of an occupant to eject a trespasser) to the jury, Silvey's attorney correctly described him as a "visitor." No one ever suggested he was a resident.

[4]We note the use of the term, "residential occupant," in *People* v. *Owen* (1991) 226 Cal.App.3d 996 [277 Cal.Rptr. 341], and *People* v. *Brown* (1992) 6 Cal.App.4th 1489 [8 Cal.Rptr.2d 513]. This, of course, is not the terminology of the statute, and we are unable to find any use of this phrase anywhere in the legislative history of Penal Code section 198.5. Indeed, the bill's author used the term "resident" as a synonym for "homeowner" (*People* v. *Owen, supra,* 226 Cal.App.3d 996, 1005), indicating an understanding of the statute even more restrictive than that we adopt. We have concluded the term "residential occupant" was meant not to expand the category of persons entitled to the presumption, but rather to emphasize that the presumption applies only to residents actually occupying the home at the time of the intrusion, a point worth making in both cases.

minutes of trying to deal with Corry's longtime paramour, and despite the fact no blow had yet been struck. Query who was the bigger threat to the resident of the mobilehome that night: the 130-pound abusive drunk who never threw a punch, or the visitor who had smuggled a gun into her home contrary to her wishes and chose to use it upon minimal provocation?

On the night of the killing, Silvey happened to be at the mobilehome, drinking and playing dice. By all indications, he was no more than a guest. He would therefore not be covered by Penal Code section 198.5, and it could hardly have seemed remarkable to the seasoned trial court that no one requested an instruction under that statute.

Our dissenting colleague insists that Silvey's status as a resident was an issue for the jury, and marvels that we have "conclude[d] no jury could find persuasive evidence he was." (Dis. opn., *post*, at p. 1335.) We conclude no such thing. We opine only that there was not enough in this record to alert the trial judge to the issue. It was "not one that the evidence would strongly illuminate and place before the trial court. On the contrary, it was so far under the surface of the facts and theories apparently involved as to remain hidden from even the defendant until the case reached this court on appeal." (*People* v. *Wade* (1959) 53 Cal.2d 322, 335 [1 Cal.Rptr. 683, 348 P.2d 116], overruled on other grounds, *People* v. *Carpenter* (1997) 15 Cal.4th 312, 381 [63 Cal.Rptr.2d 1, 935 P.2d 708].)

There simply was not " 'substantial evidence supportive of' " such an instruction (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 326 [185 Cal.Rptr. 436, 650 P.2d 311]), before the trial court. Had Silvey requested it, and been able to marshal facts supporting such an argument,[5] he might have been entitled to it. (Cf. *People* v. *Owen*, *supra*, 226 Cal.App.3d 996.) But to require the trial court to have determined the instruction was necessary on the facts actually before it would require a prescience not previously attributed to the mortal bench.[6]

---

[5] Unlike the dissent, we do not think hiding your gun in someone's home supports your claim of residency there.

[6] This is especially true since, had he somehow anticipated the issue, the trial judge would have found that *Owen* holds, on facts the dissent admits to be utterly indistinguishable from ours, that the instruction is not required sua sponte. Our dissenting colleague has misgivings about the *Owen* decision, some of which we share. But trial judges as good as the one who heard this case discipline themselves not to second-guess appellate decisions. Even the most conscientious and scholarly trial judge, faced with a recent, indistinguishable, unquestioned decision from the Court of Appeal explicitly so holding, would have concluded no instruction under Penal Code section 198.5 was necessary here.

## III

Finally, Silvey assails the competence of trial counsel for failing to request an instruction under Penal Code section 198.5. We decline to address this issue.

■ Ineffective assistance of counsel claims are rarely cognizable on appeal. "As [the Supreme Court] explained in [*People* v.] *Pope* [(1979)] 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1], because, in general, it is inappropriate for an appellate court to speculate as to the existence or nonexistence of a tactical basis for a defense attorney's course of conduct when the record on appeal does not illuminate the basis for the attorney's challenged acts or omissions, a claim of ineffective assistance is more appropriately made in a habeas corpus proceeding, in which the attorney has the opportunity to explain the reasons for his or her conduct. 'Having afforded the trial attorney an opportunity to explain, courts are in a position to intelligently evaluate whether counsel's acts or omissions were within the range of reasonable competence.' (*Id.*, at p. 426, fn. omitted.)" *People* v. *Wilson* (1992) 3 Cal.4th 926, 936 [13 Cal.Rptr.2d 259, 838 P.2d 1212].

Since we can find no indication the instruction urged by appellate counsel was warranted, we find no basis in the record for a challenge to the competence of trial counsel. If there is a basis which does not appear, it can be raised by way of writ. ■ "Because claims of ineffective assistance are often more appropriately litigated in a habeas corpus proceeding, the rules generally prohibiting raising an issue on habeas corpus that was, or could have been, raised on appeal [citations] would not bar an ineffective assistance claim on habeas corpus." (*People* v. *Mendoza Tello* (1997) 15 Cal.4th 264, 267 [62 Cal.Rptr.2d 437, 933 P.2d 1134].)

The judgment is affirmed.

Rylaarsdam, J., concurred.

WALLIN, Acting P. J., Concurring and Dissenting.—I agree with my colleagues' conclusions that the evidence was sufficient to sustain the conviction and that Silvey has not established his attorney was incompetent for failing to request an instruction on the presumption under Penal Code section 198.5.[1] I dissent from their conclusion the trial court did not have a

---

[1]All statutory references are to the Penal Code.

sua sponte duty to give such an instruction.[2] Because resolution of that issue turns largely on the facts, and because I view the factual scenario presented at trial somewhat differently than my colleagues, I recite my perception of the evidence.[3]

Lonnie Ray Silvey worked as a security guard at a used car lot. He was provided a back room where he could sleep but it had no shower facilities. Pamela Corry, his friend of three years, gave him a key to her trailer and told him he could shower there once a day. Occasionally Silvey would come home very late and he also had permission to sleep on her couch. The understanding was he could either stay at her trailer or stay at the room where he worked. There was no indication Silvey and Corry were romantically involved, however.

Rodney Robinson, the victim, had been Corry's boyfriend for about four years and lived with her in the trailer. The relationship was rocky, however, and she had recently broken it off. Because Robinson had no place to go, she allowed him to sleep on the couch for some time after they broke up.

Robinson, a small man, was an alcoholic who drank throughout the day. He had been verbally abusive to Corry, and although he never actually beat her, he would painfully poke her in the chest to make a point when they argued. He had used the same poking behavior toward Silvey on occasion. Robinson's drinking and aggression increased during the weeks before his death.

Three days before his death, Robinson came to the trailer as Corry was getting ready for a date. They discussed their breakup, and Robinson became

---

[2]Because I believe the instruction was required, I would find Silvey did not establish incompetence of counsel because he did not show why his lawyer did not request the instruction. (See *People* v. *Wilson* (1992) 3 Cal.4th 926, 936 [13 Cal.Rptr.2d 259, 838 P.2d 1212].)

[3]Although an appellate court presumes the jury resolved all credibility issues and factual conflicts against Silvey and drew all inferences in the prosecution's favor, it must consider the " '*whole record*—i.e., the entire picture of the defendant put before the jury—and may not limit [its] appraisal to isolated bits of evidence selected by the respondent.' " (*People* v. *Johnson* (1980) 26 Cal.3d 557, 577 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) Moreover, the task of deciding whether the evidence justified giving a sua sponte instruction differs from the process of deciding whether it supports the conviction. In the former case the question is whether there was evidence that a reasonable juror would find deserved consideration and was persuasive relating to the instruction. In the latter case, the question is whether a juror could find the defendant guilty beyond a reasonable doubt based on the evidence. (Compare *People* v. *Barton* (1995) 12 Cal.4th 186, 201, fn. 8 [47 Cal.Rptr.2d 569, 906 P.2d 531] with *People* v. *Johnson, supra,* 26 Cal.3d at pp. 576-577.) For obvious reasons, the presumption afforded the prosecution in determining the sufficiency of the evidence to support the conviction is inapplicable in deciding whether the defendant was entitled to have a jury *consider* an appropriate defense.

angry and kicked the bathroom cabinet doors, just missing Corry. Corry jumped back and ordered him to leave.

Robinson returned later that night while Corry was away and confronted Corry's sister, Karen Whitworth. Robinson slammed his fists against the kitchen wall, knocking two pictures to the floor. Whitworth rehung them, and Robinson hit her in the side of the head, using his open hand without full force. He blamed Whitworth for causing the breakup. He was very drunk and abusive and frightening.

Robinson berated Whitworth for an hour, and became angrier and more volatile. Whitworth succeeded in luring him outside and locking the doors, but Robinson used his key to reenter. Whitworth retreated to the bedroom, but Robinson pursued her, punching at her and eventually breaking the door. At one point, Whitworth was holding a knife and fork and Robinson told her, "Go ahead. Do it." He eventually left without harming her further.

Robinson returned again about 5:30 a.m., rattled Corry's bedroom door, and when she confronted him, he said he was trying to get in to see her. They talked in her bedroom for about four hours. Robinson was drunk and aggressive and poked Corry as he talked to her. Eventually, she told him she was through talking, that she wanted her key back, and that he should not come back. He gave her the key and they hugged and cried together.

Robinson went to Silvey, who was sleeping on the couch, and said, "You're next." When Silvey did not respond, Robinson poked him and said, "I want to talk to you." Silvey did not awaken, and Robinson shoved Silvey with his fists. Robinson said he was angry because Silvey had talked about him to Corry's friends. Silvey said he did not understand. When Corry again told Robinson to leave, he yelled at Silvey, but eventually left.

The next evening, Corry went to compete in a dart tournament at a bar. Because Robinson, her usual partner, had said he did not know if he would go, Corry asked Silvey to come and compete with her if necessary. Although Robinson came to the tournament and competed with Corry, he did not sit with the others. During the evening he became increasingly drunk and angry.

Outside the bar, Robinson grabbed Corry by the arms and then the neck. He was very angry and said she had ruined his life. He squeezed her neck, causing pain. When he released her, Corry backed away, told him to leave her alone, and ran back into the bar. She told Silvey she was leaving, and if he wanted a ride, he needed to come then.

When they went outside, a friend convinced them to go to another bar until Corry was calm enough to drive. About five minutes later, Robinson

entered, sat at the other end of the bar and glared at them. When he came over and began to yell, they moved to another table. Silvey told Robinson they did not need to put up with his behavior any more. Two other men eventually talked Robinson into leaving, but he "flipped [Corry and Silvey] off" as he departed.

Silvey went to Corry's apartment the next night after work. They drank and played dice during the evening. About 9:20 p.m., Robinson appeared on Corry's back porch very drunk and banged on her door. Although Corry told him to leave, Robinson said he was going to see which boyfriend she had over that evening. When she said it was only Silvey, Robinson said, "Move out of the way, bitch," pushed her aside, and barged into the trailer.

Robinson sat on a couch next to Silvey, who moved away. Robinson was very angry and resumed the argument from the night before. Silvey tried to calm him, but Robinson moved over toward Silvey and began to poke him, saying it was Silvey's fault his life was falling apart.

After about two minutes, Silvey said, "We don't have to put up with this anymore. Just call 911 and just ask them to come and help get him out." Corry complied after Silvey urged her again.

Silvey pulled out a gun and pointed it at Robinson. He had apparently kept it in a holster under the couch, without Corry's knowledge and against her wishes. He told Robinson, "You need to leave. We want you to leave now. Please."

Robinson turned to face Silvey on the couch and Silvey retreated. Robinson followed, scooting down the couch. When Silvey got to the end of the couch, he held his foot out to keep Robinson at bay. Robinson was up on one knee, lunging at Silvey, trying to get the gun. He yelled at Silvey to shoot him.[4]

Silvey was up on the arm of the couch with his back to the wall. He repeatedly told Robinson to back off and stay away, and continued to use his foot. He said at least once that he did not want to use the gun. Robinson continually entreated Silvey to shoot him, saying he wanted to die.[5]

At some point while Corry was talking to the 911 operator, Silvey shot Robinson. Robinson kept lunging at Silvey and grabbing for the gun. Silvey

[4]A day or two later, Corry found a tape recording on which Robinson talked about killing himself and wishing someone would do it for him. He also told a mutual friend he wanted to kill himself.

[5]Corry's trial testimony that Robinson threatened to shoot Silvey if he got the gun, something she had not told the police, should not be considered because the evidence must be reviewed in a light most favorable to the prosecution.

was backed up against the wall and had no place to retreat. Robinson did not seem to be slowed down by the shots and was angrier. Silvey shot two or three more times, but although Robinson was slowed, he kept coming at Silvey. Silvey shot one more time, ending the fray. Silvey put the pistol on the dining room table and waited for the police.

Silvey had shot Robinson five times, four times in the chest and once in the forehead. He died of blood loss from the chest wounds. He was probably incapacitated from them within a minute or so from the time he was shot. The shots were fired from more than a foot away, although Corry estimated Robinson was from six inches to a foot away from Silvey.

Section 198.5 creates a rebuttable presumption that a resident has a reasonable fear of death or great bodily injury when he uses deadly force against an unlawful forcible intruder. (*People* v. *Brown* (1992) 6 Cal.App.4th 1489, 1494 [8 Cal.Rptr.2d 513].) "[T]he statute was enacted to permit residential occupants to defend themselves from intruders without fear of legal repercussions, to give 'the benefit of the doubt in such cases to the resident, establishing a presumption that the very act of forcible entry entails a threat to the life and limb of the homeowner.' (Press Release from the office of Sen. H. L. Richardson (the bill's author) Oct. 1, 1984.)" (*People* v. *Owen* (1991) 226 Cal.App.3d 996, 1005 [277 Cal.Rptr. 341].)

"[F]our elements must be met. There must be an unlawful and forcible entry into a residence; the entry must be by someone who is not a member of the family or the household; the residential occupant must have used 'deadly' force (as defined in § 198.5) against the victim within the residence; and finally, the residential occupant must have had knowledge of the unlawful and forcible entry." (*People* v. *Brown, supra,* 6 Cal.App.4th at pp. 1494-1495.) Apparently, once the elements are met, the presumption arises, even in the absence of any knowledge or belief the intruder is armed.

The Attorney General relies on *People* v. *Owen, supra,* 226 Cal.App.3d 996, where the court held it was not necessary to give an instruction based on section 198.5 because the concept was adequately covered by instructions on the general presumption of innocence and the prosecution's burden to prove the case beyond a reasonable doubt. (226 Cal.App.3d at p. 1004.) The court reasoned that the effect of section 198.5 was to require the prosecution to prove beyond a reasonable doubt that the defendant did not fear imminent death or great bodily injury by the intruder, and that this concept was covered by general instructions on the prosecutor's duty to prove the absence of justification or excuse beyond a reasonable doubt. (226 Cal.App.3d at pp. 1005-1006.)

I disagree with the *Owen* court to the extent it suggests general instructions on the prosecution's burden adequately cover the statutory presumption that an intruder creates a reasonable fear of great bodily injury or death in the occupant.[6] The notion of a mere intrusion giving rise to such a reasonable fear is not inherent in any of the general instructions.

Although several instructions involving self-defense and defense of habitation were given in Silvey's case (e.g., CALJIC Nos. 5.40, 5.42, 5.43 (5th ed. 1988)), none of them convey the crucial concept imparted by the presumption. The presumption was vital to Silvey because, as my colleagues conclude, the jury may well have found Silvey unreasonably shot an unarmed man.

The *Owen* court also opined the defendant would have had a right to the instruction on request because it was in the nature of an instruction on reasonable doubt pinpointing certain elements in the case. (*People* v. *Owen*, *supra*, 226 Cal.App.3d at pp. 1006-1007.) It was not such an instruction. The presumption does not deal with an element of an offense. It tells the jury how it should evaluate evidence relating to a defense. It directs the jurors to presume a fact, reasonable fear of death or great bodily injury, when other facts are present. The instruction says nothing about reasonable doubt, and does not relate to that concept, except to the extent all facts and inferences are related to that ultimate determination. Because I am not persuaded *Owen* is correct, it is appropriate to examine whether an instruction based on section 198.5 should have been given sua sponte.

A court must instruct the jury sua sponte as to a defense " 'if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 326 [185 Cal.Rptr. 436, 650 P.2d 311].) Substantial evidence supported an inference Silvey was defending Corry, himself and the residence from Robinson, and he clearly relied on self-defense and its corollaries. Indeed, the court gave numerous instructions on the topic.

But although Silvey was relying on those defenses to exonerate himself, nothing indicates he was relying on the presumption created by section 198.5. It is not necessary to determine, however, whether one must rely on the presumption, as opposed to self-defense in general, to be entitled to a sua sponte instruction on it. The other condition that triggers the need for a sua

---

[6]Since my colleagues conclude the instruction was unnecessary because the evidence was insufficient to show Silvey was a resident, they have no cause to analyze *Owen* or discuss other issues the parties raise concerning the instruction.

sponte instruction was met: There was substantial evidence the presumption applied.

When used to determine whether a sua sponte instruction should have been given, "[s]ubstantial evidence [means] evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury *could* find persuasive. [Citation.]" (*People* v. *Barton, supra,* 12 Cal.4th at p. 201, fn. 8, italics added.)[7] A reasonable jury could have found all of the elements were present for the section 198.5 presumption to arise. Robinson, who was banned from the residence by the owner, Corry, barged in over her objection, and Silvey knew it. The entry was a forcible, unlawful trespass, and Silvey used deadly force in response to Robinson's threatening conduct.

The only close question is whether Silvey was a resident. My colleagues conclude no jury could find persuasive evidence he was. That conclusion is somewhat surprising because both parties to the appeal appear to assume Silvey was a resident for purposes of the instruction. The trial court apparently agreed because it gave instructions relating to a resident's right to defend against an intruder. But the question is not what this court or the trial court or the parties think, it is what a jury could have found to be persuasive. (*People* v. *Barton, supra,* 12 Cal.4th at p. 201, fn. 8.)

There was ample persuasive evidence Silvey lived at Corry's trailer. He had keys to the residence, showered there regularly, and sometimes slept there with the understanding he could do so whenever he desired. His only other possible abode was the back room of the car dealership, which had no shower facilities. On two of the three occasions described by the evidence, Silvey was at Corry's trailer, sleeping there once.

Although a reasonable jury might have found Silvey was not a resident, it could just as easily have found that he was. He kept his gun there, indicating he believed it was a habitat worth protecting. Nothwithstanding Corry's attitude concerning the danger Robinson presented,[8] Silvey obviously believed he posed a danger when he asked Corry to summon police aid. When Robinson, the crazy drunk, was not moved to leave by the threat of police

---

[7] My colleagues appear disinclined to utter the phrase "could find persuasive" as it relates to the substantial evidence test for jury instructions, choosing instead to rely on verbiage from a 1959 case and to mention only one of the many facts that a jury might have found persuasive. Whether or not the "could find persuasive" standard is a fair onus to place on a trial judge is not for us to decide. But like it or not, it is the test and I will apply it to all the evidence on the subject.

[8] Although Corry's attitude is utterly irrelevant, my colleagues put some emphasis on it. I find it hard to believe they would allow a husband to trump his wife's perception of a danger presented or a resident landlord to do so with respect to a tenant.

intervention, Silvey pointed his gun at him and implored him to "please" leave. Silvey behaved like a person who felt threatened in his residence and tried to remove that threat by using incrementally stronger force, shooting only when Robinson ignored the weapon and assaulted him.

Although a reasonable jury might not have been persuaded Silvey was a resident, the point is it should have been given the opportunity to make the determination. In a close case like this, Silvey should not have been deprived of that determination.

An additional inquiry is in order, however. "[A] trial court must instruct on the general principles of law governing the case, i.e., those principles relevant to the issues raised by the evidence, but need not instruct on specific points developed at trial. 'The most rational interpretation of the phrase "general principles of law governing the case" would seem to be . . . those principles of law commonly or closely and openly connected with the facts of the case before the court.' [Citations.]" *(People* v. *Flannel* (1979) 25 Cal.3d 668, 681 [160 Cal.Rptr. 84, 603 P.2d 1], fn. and italics omitted.) Is the presumption created by section 198.5 such a principle?

Unfortunately, the courts have not further defined or refined the phrase " 'those principles of law commonly or closely and openly connected with the facts of the case before the court.' [Citations.]" *(People* v. *Flannel, supra,* 25 Cal.3d at p. 681, italics omitted.) Obviously, a court must instruct sua sponte on applicable defenses that are not inconsistent with the defense theory of the case. (See *People* v. *Montoya* (1994) 7 Cal.4th 1027, 1047 [31 Cal.Rptr.2d 128, 874 P.2d 903].) And, although the court need not instruct sua sponte on common law defenses that have not previously been developed by the cases *(People* v. *Flannel, supra,* 25 Cal.3d at p. 683), it must do so when the defense is recognized by statute. (See *People* v. *Threestar* (1985) 167 Cal.App.3d 747, 754 [213 Cal.Rptr. 510] [court erred by failing to instruct sua sponte on embezzlement defense under section 511].) But section 198.5 does not create a defense. It creates a presumption in aid of a defense.

I have looked for cases where the defense has argued instructions on presumptions relating to a defense should be given sua sponte, and have found only the obvious proposition that a court must instruct sua sponte on the presumption of innocence. (See, e.g., *People* v. *Sering* (1991) 232 Cal.App.3d 677, 688 [283 Cal.Rptr. 507].) Nevertheless, an instruction on the presumption created by section 198.5 should have been given. It certainly expresses a principle of law and does so in a public statute. The presumption is crucial to a proper verdict in the case because it gives the

defense a powerful tool when the defendant shoots an unarmed intruder. And, as noted, there is sufficient evidence in support of the elements required to trigger the presumption, and such evidence gives rise to the court's duty to instruct.

The presumption created by section 198.5 is a principle of law closely and openly connected with the facts of Silvey's case. The court had a sua sponte duty to instruct on it.[9] Because the case was so close, the facts were not materially in dispute, and the case may well have turned on the reasonableness of Silvey's production of the gun, it is reasonably likely a different verdict would have been rendered had the instruction been given. I would reverse the judgment and remand the matter for a new trial.

A petition for a rehearing was denied November 19, 1997, and appellant's petition for review by the Supreme Court was denied January 21, 1998.

---

[9]This conclusion is not intended as an indictment of the trial court's judicial capabilities. The parties were also apparently unaware of the relatively new section 198.5 and, indeed, this is the first opportunity this court has had to consider it. The purpose of requiring sua sponte instructions is not to allow appellate courts to reflect poorly on trial courts, but to ensure defendants will only be convicted fairly, and only after a full consideration by the trier of fact of all pertinent legal principles. That goal would be accomplished here by a reversal.