Filed 4/15/16

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>ANTOINE C. GRAYS,<br><br>          Defendant and Appellant. | A139538<br><br>(San Francisco County<br>Super. Ct. No. SCN 215038) |

Appellant Antoine C. Grays appeals from his conviction after a jury trial of second degree murder. He contends the trial court erred in (1) failing to issue jury instructions on defense of another in one's residence; (2) refusing to modify an instruction on the duty to retreat; (3) issuing an instruction about the unavailability of self-defense for a person who provoked the fight; (4) excluding certain defense exhibits; (5) excluding certain evidence of the victim's prior acts; and (6) cumulative error. In the published portion of the opinion, we conclude the trial court too narrowly defined the word "residence" and erred in refusing to instruct the jury pursuant to Penal Code section 198.5.[1] That section provides that a person using force within his or her residence against a person who forcibly entered the residence shall be presumed to have held a reasonable fear of injury to self or another member of the household. In the unpublished portion of the opinion, we find the error harmless and reject appellant's other contentions that the trial court committed reversible error.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I.C.–VI.

[1] All undesignated section references are to the Penal Code.

PROCEDURAL BACKGROUND

In 2011, appellant was charged with the first degree murder of Sylvestri Brown (§ 187, subd. (a)) with the use of a firearm (§ 12022.53, subd. (d)); being a felon in possession of a firearm (§ 12021, subd. (a)(1)); and receiving stolen property (§ 496, subd. (a)). In 2013, a jury acquitted appellant of first degree murder, convicted him of the lesser included offense of second degree murder and found true the use of firearm allegation, convicted him of being a felon in possession, and acquitted him of receiving stolen property. The trial court sentenced appellant to state prison for 40 years to life.

FACTUAL BACKGROUND

*Prosecution Evidence*

In January 2011, appellant was living in unit 930 of the Potrero Hill Housing Project with his girlfriend, Toyia Taylor.[2] Rhodena Mixon, who was dating Brown, lived in unit 926 with her 25-year-old son, Zakariah Shabazz. The front doors of units 926 and 930 were in the same hallway or vestibule, along with the doors to two other units. Three steps led down from this hallway to an exterior walkway. The front door to unit 930 opened into a flight of stairs which led up to the unit's living area.

On January 30, 2011, shortly after 8:00 p.m., Brown arrived at Mixon's apartment. He was initially upset with Mixon but then calmed down. About 10 minutes later, appellant knocked on Mixon's door and asked to use her phone. Brown responded, "I don't want you coming over here to my woman's house. You need to leave." Appellant left, but returned about five minutes later. He repeated his request to use the phone, saying it was an emergency. Brown was upset and said to appellant, "I asked you not to come back to my woman's house." Appellant backed away from Mixon's door and Brown followed him into the hallway and then outside the building. Shabazz followed them and stood on the top step leading to the exterior walkway.

Brown was "in [appellant's] face," telling appellant "I'm going to fucking whip your ass." Appellant told Brown, "if you don't get up out of my face, I got a gun and I'm

---

[2] Taylor was initially charged as a co-defendant. Her case was severed prior to trial.

going to shoot you." Brown, unfazed, told appellant to "pull that shit out." Appellant pulled out a gun, pointed it at Brown, and tried to fire, but the gun jammed. At this point, Shabazz went back to his apartment. He could hear the men continue to argue outside. About a minute later, Shabazz heard a gunshot outside the building. Mixon testified she heard three shots coming from outside; she initially told the police she heard the gunshot echo in the hallway. Shortly after the gunshot, Brown fell against Mixon's door and said, "he shot me." Brown died soon thereafter.

Hakim T., then 13 years old, heard an argument outside his second floor apartment and looked out the window. He saw a man and a woman standing by the hallway entryway of the building behind his, arguing with someone inside the hallway. Hakim's description of the woman—a "big" light-skinned African-American wearing a purple shirt—matched Taylor. The man reached around the woman and shot into the hallway.[3]

After Brown was shot, appellant and Taylor went to Rebecca Padilla's house. Officers apprehended them as they left later that night. Appellant was wearing different clothing. Taylor was holding Play-Doh, which can be used to remove gunshot residue. Police found the gun used to kill Brown in a backpack carried by Taylor.[4]

Police interviewed appellant after advising him of his *Miranda* rights.[5] Appellant denied living in unit 930, knowing Brown, knowing that someone got shot, or knowing anything about the gun in Taylor's backpack. He admitted being in a relationship with Taylor. While in county jail, appellant made several phone calls which were recorded.[6] On these calls, appellant said he "fucked up big time," it was "[m]y fault," and he "didn't listen."

---

[3] Hakim initially told the police he heard the gunshot before he looked out the window. He first told authorities he saw the shot one week before trial.

[4] The gun had been stolen from its owner in October 2010. Appellant testified he bought the gun on the street.

[5] *Miranda v. Arizona* (1966) 384 U.S. 436. A video of the interview was played for the jury.

[6] The recordings were played for the jury.

Police saw no damage to the front door of unit 930. They found a spent bullet on the seventh step of the stairs inside unit 930, and a bullet strike mark on the 11th step. There was no blood on the stairs. Police found a spent casing near the exterior steps.

An autopsy showed the bullet entered Brown's lower back and exited through his abdomen. The pathologist testified the entry and exit wounds were relatively small and Brown had a large amount of blood in his abdomen when he arrived at the hospital, which could explain why there was not a lot of blood at the scene. A person with Brown's injuries could travel 10 to 15 feet. Brown had a blood alcohol level of 0.15 percent and a small amount of methamphetamine in his system. He had a set of keys with a four-inch crescent wrench on his person.

Ronan Shouldice testified for the prosecution as an expert in crime scene reconstruction and bullet trajectory. Shouldice opined that Brown was standing in the vestibule when he was shot. Shouldice concluded Brown could not have been on the stairs in unit 930 at the time he was shot, although on cross-examination he conceded his analysis would be completely changed if Brown had been bent over between zero and 45 degrees.

On rebuttal, the prosecution introduced evidence of appellant's prior acts. In 2008, appellant spit on and violently struggled with police officers attempting to detain him. In August 2010, appellant led police on a car chase, driving erratically and running several red lights before crashing and attempting to flee by foot. In December 2010, Mixon saw appellant strike Taylor in the face and body with his fists. In April 2012, while in custody, appellant struck another inmate and continued to fight him despite orders to stop.

*Defense Evidence*

Appellant testified in his defense. On the night in question, he left his apartment to go to the store and took a gun because the area was not safe: he had been shot at in 2007 and in December 2010. He made sure the gun's safety was engaged and there was no bullet in the chamber. Appellant wanted to use Mixon's phone to call his father for help moving out. Appellant thought Mixon and Brown had broken up because Mixon

4

told appellant Brown had choked her. In early 2010, Brown threatened appellant because he thought appellant had broken into his car.

Appellant returned to Mixon's apartment after trying, unsuccessfully, to use another neighbor's phone. Brown came out of Mixon's apartment screaming and threatening appellant. Appellant thought Brown had a weapon because Brown pulled a metal object from his pocket. Appellant pulled out his gun because he believed Brown was going to hurt him. As Brown continued to threaten appellant, appellant clicked the safety off his gun, continued to back up, and told Brown to calm down. Brown then darted into the hallway and said, "Fuck with mine, I'm going to fuck with yours." He ran to the front door of appellant's apartment, kicked the door open and began running up the stairs. Appellant, who was on the exterior sidewalk, believed Brown was going to hurt Taylor, who was inside the apartment. Appellant stepped into the hallway, racked the gun, and fired a single shot at Brown, aiming for his legs.

After Brown fell, appellant ran to Padilla's house and was "freaking out." He washed his clothes to get rid of the gunshot residue and put the gun in a backpack. When he left Padilla's house, police officers began punching and kicking appellant. After his arrest, he lied to the police because officers had just assaulted him and he did not trust them.

Eric Rossetter testified for the defense as an expert in bullet trajectories and crime scene reconstruction. Rossetter opined it was possible that Shouldice's conclusion about Brown's location was correct. However, Rossetter opined that Brown had to be leaning forward at the time he was shot, and therefore Brown could have been shot while he was on the stairs inside appellant's unit.

A toxicologist testified that a man with the blood alcohol and methamphetamine levels of Brown would lose critical judgment, have emotional instability, and could show irritability, aggressiveness, and violence. The defense also presented evidence of Brown's prior acts of violence. In 2004, after a night of drinking, Brown placed his then-girlfriend in a headlock and slapped her friend. In January 2011, Brown repeatedly

5

threatened a BART station agent after being caught exiting the station without paying. In 2011, Brown placed Mixon in a headlock, squeezed her neck, and would not let her go.

DISCUSSION

I. *Section 198.5 Instruction*

Appellant first contends the trial court erred in refusing to instruct the jury pursuant to section 198.5 that a person using force within his or her residence against a person who forcibly entered the residence shall be presumed to have held a reasonable fear of injury to self or another member of the household.[7] The trial court refused the instruction on the ground that unit 930 was not appellant's "residence" because he was not legally subletting the unit. We agree the trial court erred, but find the error harmless.[8]

A. *Background*

The trial testimony about appellant's living situation was as follows. In January 2011, unit 930 was leased to Michelle Marshall but she did not live there. Appellant had been living there for four or five months. He paid fifty dollars in rent each month to someone he called "Big Stone," shared a key to the apartment with Taylor, slept in the

---

[7] Section 198.5 provides: "Any person using force intended or likely to cause death or great bodily injury within his or her residence shall be presumed to have held a reasonable fear of imminent peril of death or great bodily injury to self, family, or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred. [¶] As used in this section, great bodily injury means a significant or substantial physical injury."

[8] Appellant also contends the trial court erred in failing to sua sponte instruct the jury on defense of habitation. (See § 197, subd. (2) [homicide justifiable when "committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends and endeavors, in a violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein"]; CALCRIM No. 506.) Appellant does not argue the failure to instruct on defense of habitation was more prejudicial or prejudicial in a different way than the failure to issue a section 198.5 instruction. Therefore, our conclusion that the failure to instruct on section 198.5 was harmless compels a conclusion that any error in failing to issue a defense of habitation instruction was also harmless.

6

front room, and kept his belongings in the unit. The unit had working lights and heating while appellant lived there. A San Francisco Housing Authority (Housing Authority) employee testified that subleasing was technically not allowed at the Potrero Hill Housing Project, but in fact was not uncommon. As of January 5, 2011, the Housing Authority knew Marshall was not living in the unit. Prior to January 30, 2011, a Housing Authority manager gave appellant notice that the current occupants of unit 930 would have to leave the unit, giving them a few days or weeks to pack their things.

Appellant requested, in addition to the standard defense of another instructions, the trial court instruct the jury on the section 198.5 presumption.[9] The trial court refused, concluding that section 198.5 does not apply to a person who is not a lawful resident of the home.

B. *"Residence"*

"When a legally correct instruction is requested, . . . it should be given 'if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration.' " (*People v. Wilkins* (2013) 56 Cal.4th 333, 347.) The presumption in section 198.5 applies to a person using force "within his or her residence . . . ." (See *ante,* fn. 7.) Our question is whether the jury could reasonably have found unit 930 constituted appellant's "residence."

---

[9] CALCRIM No. 3477 provides: "The law presumes that the defendant reasonably feared imminent death or great bodily injury to (himself/herself)[, or to a member of (his/her) family or household,] if: [¶] 1. An intruder unlawfully and forcibly (entered/ [or] was entering) the defendant's home; [¶] 2. The defendant knew [or reasonably believed] that an intruder unlawfully and forcibly (entered/ [or] was entering) the defendant's home; [¶] 3. The intruder was not a member of the defendant's household or family; [¶] AND [¶] 4. The defendant used force intended to or likely to cause death or great bodily injury to the intruder inside the home. [¶] [Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.] [¶] The People have the burden of overcoming this presumption. This means that the People must prove that the defendant did not have a reasonable fear of imminent death or injury to (himself/herself)[, or to a member of his or her family or household,] when (he/she) used force against the intruder. If the People have not met this burden, you must find the defendant reasonably feared death or injury to (himself/herself)[, or to a member of his or her family or household]."

7

"Because residence is not truly a synonym for domicile and its meaning in a particular statute is often subject to differing interpretations [citation], it is now well established that ' "residence" is a term of varying import and its statutory meaning depends upon the context and purpose of the statute in which it is used.' " (*People v. McCleod* (1997) 55 Cal.App.4th 1205, 1217.) "The plain language of section 198.5 shows the statute was intended to give residential occupants additional protection in situations where they are confronted in their own homes by unlawful intruders such as burglars. It is appropriate, therefore, to look at relevant burglary cases to determine whether there was an entry into a residence in this case." (*People v. Brown* (1992) 6 Cal.App.4th 1489, 1495, fn. omitted (*Brown*).) "The California Courts of Appeal have formed various tests for determining the scope of the terms 'residence' or 'building' for burglarious entry." (*Ibid*.) The *Brown* court concluded the most appropriate test focuses on the reasonable expectations of the occupant: "Since one of the purposes of the burglary statute is to protect against unauthorized entry and the attendant danger that the occupant will react violently to the intrusion, the reasonable expectation test focuses on the protection the inhabitants of a structure reasonably expect. . . . [¶] This safety-based reasonable expectation test is appropriate for the issue presented here involving section 198.5. This is because section 198.5 gives a defendant a rebuttable presumption that he was in reasonable fear of imminent danger when he used deadly force within his residence against an intruder (most likely a burglar) who unlawfully and forcibly entered the residence." (*Id.* at p. 1496 [finding unenclosed front porch not a residence].)

If the jury believed appellant's testimony regarding his living situation, it could reasonably have found he had a reasonable expectation of protection against unwanted intruders in unit 930. Appellant had been in the unit for four or five months, paid rent, and had a key to the unit. Moreover, the Housing Authority in fact knew of his presence but had not immediately ejected him, giving him some days or weeks to move.

This conclusion is supported by *People v. Rojos* (1995) 31 Cal.App.4th 611 (*Rojos*), a burglary case, although it interprets the term "inhabited dwelling house" rather than "residence." In *Rojos,* the defendant was convicted of first degree burglary—

defined to include the " 'burglary of an inhabited dwelling house' "—after entering the victim's cabin. (*Id.* at pp. 613, 614, fn. 2.) The evidence "was largely to the effect that [the victim] did not have any possessory right to the . . . cabin she was occupying on the night in question." (*Id.* at p. 614.) The defendant argued the jury should have been instructed that, if the victim was a trespasser, he could only be convicted of second degree, not first degree, burglary. (*Ibid.*) The Court of Appeal rejected this argument: "[T]he 'inhabited building' distinction between first and second degree burglary is designed to protect the personal safety of the 'inhabitants.' [¶] This being the case, of what possible difference is it whether the inhabitant of the building in question has a 'possessory right' to the premises or not? Should we give a tenant who is 'holding over' in a dispute with his/her landlord over the validity of an eviction notice less protection than one as to whom there is no dispute? . . . If there was a dispute about [the victim's] right to occupy [the cabin], that was a matter between her and the [owner's] management (or, under some circumstances, perhaps the sheriff). But it should not and does not make any difference as far as the application of the relevant Penal Code provisions to the building in question." (*Id.* at p. 615.)

*People v. Silvey* (1997) 58 Cal.App.4th 1320, relied on by the People, is distinguishable. In that case, a divided panel concluded the defendant "was never shown to be, nor did he ever claim to be, a resident [of the house where he killed the victim]. According to [the homeowner], [the defendant] lived in a small room at his worksite which had no shower facilities, and she '. . . told him he could come over once a day and take a shower. And then on occasion, when he came home really late at night, I told him it was okay for him to sleep on the couch.' This certainly does not sound like any kind of residency the law has previously recognized, and we can discern no indication the Legislature wanted to extend the protection of the presumption to guests." (*Id.* at p. 1327, fns. omitted; but see *id.* at p. 1335 (conc. & dis. opn. of Wallin, J.) ["Although a reasonable jury might have found [the defendant] was not a resident, it could just as easily have found that he was."].) Unlike the defendant in *Silvey,* appellant testified he

9

was more than a guest in unit 930: he paid rent, kept his belongings there, and had been living there for four or five months.

The People point to legislative history using the term "homeowner" to describe persons protected by the statute, and argue this indicates "residence" should be construed restrictively.[10] The legislative history contains no express discussion of the scope of the term "residence." While legislative committee reports analyzing the bill frequently use the term "homeowner," it appears to be simply a shorthand for resident. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1134 (1983–1984 Reg. Sess.) as amended Jan. 13, 1984 [hereafter Sen. Com. on Judiciary Analysis]; Assem. Com. on Criminal Law & Public Safety, Supp. Analysis of Sen. Bill No. 1134 (1983–1984 Reg. Sess.) as amended Jan. 24, 1984 [hereafter Assem. Com. on Criminal Law Analysis].) For example, one committee report discusses a scenario in which a "busybody landlord[]" was shot by "the homeowner." (Sen. Com. on Judiciary Analysis, p. 4.) There is no indication the Legislature intended to restrict the application of the statute to those who actually own their homes, and we also see no legislative intent to apply the statute restrictively.

To the contrary, the statute's purpose as described in the legislative history would be frustrated if we relied on the nuanced, and sometimes arcane, laws of trespass or landlord-tenant to define the scope of "residence" in section 198.5. That statutory purpose supports the conclusion in *Brown* that the appropriate analysis considers whether the resident had a reasonable expectation of protection against unwanted intruders. The legislative history consistently described the purpose of the bill as providing protection

---

[10] The People point to language in a press release issued by the bill's author after the bill's enactment. (See *People v. Owen* (1991) 226 Cal.App.3d 996, 1005 (*Owen*) [quoting Oct. 1, 1984 press release]; Stats. 1984, ch. 1666, § 1 [enacted Sept. 30, 1984].) We note this press release is of questionable value for purposes of legislative history. (See *California Highway Patrol v. Superior Court* (2006) 135 Cal.App.4th 488, 501 ["The views of an individual legislator or staffer concerning the interpretation of legislation may not properly be considered part of a statute's legislative history, particularly when the views are offered after the statute has already been enacted."].) However, as discussed *post*, the same language appears in pre-enactment committee reports.

against "intruder[s]" and "attacker[s]" in one's "home" or "dwelling." (Sen. Com. on Judiciary Analysis, at p. 8; Assem. Com. on Criminal Law Analysis, at p. 2; Assem. Off. of Research, 3d reading analysis of Sen. Bill No. 1134 (1983–1984 Reg. Sess.) Aug. 16, 1984, p. 2.) The bill was specifically discussed in the context of protection against burglars. (Sen. Com. on Judiciary Analysis, at pp. 4–6.) The bill's author, in a letter to the governor urging him to sign the bill, described it as "a significant deterrent against burglary and all of its resultant problems including that of injury to dwelling occupants present at the time of the burglary attempt." (Sen. H.L. Richardson, letter to Governor George Deukmejian, Sept. 6, 1984, p. 1.)[11]

We note two isolated instances in committee reports where the protected person is referred to as "legal occupant" or "legal owner or tenant." One analysis, in discussing the symbolic effect of the bill, notes it "appears to give the legal occupant of a dwelling 'carte blanche' permission to use deadly force to stop an intruder from entering, or to compel an intruder to leave." (Assem. Com. on Public Safety Analysis, p. 3.) Another analysis of the initial version of the bill—which provided that a person who, while in his or her residence, killed or injured another who entered "without lawful or justifiable cause," was not guilty of assault or murder (Sen. Bill No. 1134 (1983–1984 Reg. Sess.) as introduced Mar. 4, 1983)—discusses a hypothetical scenario in which "an ex-roommate returning to an apartment he or she no longer had a lawful right to occupy for the purpose of retrieving some belongings was killed by the legal owner or tenant . . . ." (Sen. Com. on Judiciary, Analysis of Sen. Bill. No. 1134 (1983-1984 Reg. Sess.) as introduced, p. 4.) As noted above, the legislative history did not expressly discuss the scope of the term "residence" or the specific population to be protected by the statute. In light of the clear purpose of the statute and the resulting analysis discussed above, we

---

[11] We recognize that "statements [in letters to the governor] about pending legislation are entitled to consideration to the extent they constitute 'a reiteration of legislative discussion . . . rather than merely an expression of personal opinion.' " (*Martin v. Szeto* (2004) 32 Cal.4th 445, 450–451.) The statement here is consistent with the discussion in legislative analyses about the purpose of the bill.

decline to find that these passing mentions of "homeowners" and "legal occupants" in committee reports preclude a jury from finding unit 930 was appellant's "residence." (*Medical Board v. Superior Court* (2003) 111 Cal.App.4th 163, 179 ["We rely on the legislative history of an ambiguous statute as dispositive only when that history is itself unambiguous."]; accord, *Siskiyou County Farm Bureau v. Department of Fish and Wildlife* (2015) 237 Cal.App.4th 411, 439.)

We conclude a reasonable jury could have found unit 930 constituted appellant's residence for purposes of section 198.5. The trial court therefore erred in refusing to issue the requested instruction.

C. *Prejudice*

We now turn to whether the error was harmless. As an initial matter, we disagree with appellant's contention that the error violated his federal constitutional rights because it constituted a failure to instruct the jury on a defense and/or because it improperly diluted the prosecution's burden of proof. Appellant's defense was that he acted in lawful defense of another and the jury was provided with the standard instructions on this defense. (CALCRIM No. 505.) These instructions included the following: "The defendant is not guilty of murder/ or manslaughter if he was justified in killing someone in defense of another. The defendant acted in lawful defense of another if: [¶] 1. The defendant reasonably believed that Toyia Taylor was in imminent danger of being killed or suffering great bodily injury; [¶] 2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger; [¶] AND [¶] 3. The defendant used no more force than was reasonably necessary to defend against that danger." The instructions also expressly provided that: "The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant not guilty of murder or manslaughter." In addition, the jury was generally instructed on the presumption of innocence and the People's burden to prove appellant guilty beyond a reasonable doubt. (CALCRIM No. 220.) Because the jury was instructed on appellant's defense—defense

12

of another—and was properly instructed on the People's burden of proof, the error was one of state law only.[12]

In closing arguments, the prosecutor argued appellant did not act in defense of Taylor because the evidence showed Brown did not kick down the door to unit 930 and was in the vestibule, not on the stairs, when he was shot. In other words, the prosecutor's argument was that Brown was *not inside unit 930* when appellant shot him.[13] If the jury credited the prosecution witnesses on this issue, an instruction on the section 198.5 presumption would have had no impact on the case.

The jury's guilty verdict on the murder charge—instead of a voluntary manslaughter verdict—strongly indicates the jury found that Brown was not in unit 930 at the time he was shot. The jury was instructed that if they found appellant held an actual but unreasonable belief that Taylor was in imminent danger, they must find him guilty of voluntary manslaughter. (CALCRIM No. 571.) Defense counsel emphasized this in closing arguments. According to both appellant and Shabazz, Brown and appellant were outside the building for part of their argument. Appellant testified that Brown then ran inside to the hallway containing the entrances to both appellant's and Mixon's units, entered unit 930, and proceeded up the stairs.[14] Had the jury credited appellant's testimony that Brown entered unit 930, it is very likely the jury would also have credited appellant's testimony that he feared for Taylor's safety: if Brown were running defensively away from appellant, instead of offensively toward Taylor, he most likely would have sought safety in Mixon's unit instead of appellant's. Therefore, if the

---

[12] Because we conclude the instructional error was one of state law, we reject appellant's contention that the error is either reversible per se or should be reviewed for prejudice pursuant to the standard set forth in *Chapman v. California* (1967) 386 U.S. 18. (*People v. Breverman* (1998) 19 Cal.4th 142, 174–175.)

[13] The prosecutor did argue, in passing, that appellant's defense was not credible because if Brown had run up the stairs, appellant would have either tackled him or shot him multiple times.

[14] As noted above, appellant testified Brown kicked in the door to unit 930, but police saw no damage to the door.

jury credited appellant's testimony that Brown was in unit 930 when he was shot, they would have concluded appellant acted in either reasonable or imperfect defense of Taylor and convicted him, at most, of voluntary manslaughter.

In addition, as noted above, the jury was properly instructed that the People bore the burden of proving, beyond a reasonable doubt, that the killing was not justified, and that the killing was justified if appellant acted in defense of another. (See *Owen, supra,* 226 Cal.App.3d at pp. 1007–1008 [finding no prejudice from counsel's failure to request section 198.5 instruction in part because jury was properly instructed on the People's burden to prove homicide unjustified].)

Because it is not reasonably probable the jury found Brown was in unit 930 when appellant shot him, it is not reasonably probable that a section 198.5 instruction would have changed the verdict. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

II. *Duty to Retreat Instruction*

Appellant next argues the trial court erred in refusing to modify a jury instruction regarding the duty to retreat. The jury was instructed, in the context of the defense of another instructions: "A defendant is not required to retreat. He or she is entitled to stand his or her ground and defend himself, if reasonably necessary, to pursue an assailant until the danger of death or great bodily injury has passed. This is so even if safety could have been achieved by retreating." (See CALCRIM No. 505.) The trial court refused appellant's request to modify the standard jury instruction to provide that a defendant can stand his ground and defend himself *or another*. Appellant argues the duty to retreat principle applies equally in cases involving the defense of another. Respondent does not dispute this contention but argues it is reasonably likely the jury understood the instruction to apply in the defense of another context.

Assuming the trial court erred in refusing the modification, we find any error harmless. Appellant argues the jury could have interpreted the instruction to be an incorrect statement of law, meaning that because "Brown was not a threat to *appellant* at the time he [was] shot since he was running in the opposite direction . . . appellant did not have a right to stand his ground or pursue Brown." "In reviewing the purportedly

14

erroneous instructions, 'we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' [Citations.] In conducting this inquiry, we are mindful that ' "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." ' " (*People v. Frye* (1998) 18 Cal.4th 894, 957, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) We do not find it reasonably likely the jury construed the instruction in this manner. The jury was properly instructed on the defense of another and those instructions make clear that danger to the defendant is *not* an element of the defense.[15] In closing arguments, the prosecutor argued that appellant's defense of another claim was not credible; he did not argue appellant had a duty to retreat because Brown did not pose a threat to *him*. Appellant has pointed to no jury question indicating the jury was confused about this issue.

Appellant also argues the jury could have understood the instruction to mean "that a person acting to protect another person must try [to] seek safety for that person by means of retreat before resorting to force . . . ." If the jury so understood the instruction, appellant was not prejudiced. As noted above, the prosecutor's argument was that appellant's entire defense of another claim was fabricated. The prosecutor did not argue appellant could have sought safety for Taylor by retreating. Moreover, had the jury credited appellant's testimony and concluded appellant was acting in defense of Taylor, there was no basis for the jury to conclude appellant could have secured Taylor's safety by retreating. Any error was harmless.

III. *Instruction On Provoking A Fight*

Appellant argues the trial court erred in instructing the jury, over defense objection: "A person does not have the right to self-defense if he or she provokes a fight

---

[15] The jury was instructed: "The defendant acted in lawful defense of another if: [¶] 1. The defendant reasonably believed that Toyia Taylor was in imminent danger of being killed or suffering great bodily injury. [¶] 2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger; [¶] AND [¶] 3. The defendant used no more force than was reasonably necessary to defend against that danger."

or quarrel with the intent to create an excuse to use force." (See CALCRIM No. 3472.) We agree there was no evidence appellant provoked the fight with Brown but find the error harmless.[16]

Under both the prosecution and defense version of events, appellant asked Mixon if he could use her phone and Brown responded by threatening appellant. The People argue there was evidence appellant provoked the fight by returning to Mixon's apartment to make a second request for the phone after Brown told appellant to leave, and therefore disrespecting Brown. There is no evidence appellant threatened or even spoke to Brown before Brown began to argue with him. The mere fact that he returned to Mixon's apartment does not constitute substantial evidence that he provoked a fight with Brown with the intent to create an excuse to use force.

Error in providing an instruction that "has no application to the facts of the case" is "one of state law subject to the traditional *Watson* test." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129–1130.) The People did not argue to the jury that appellant could not invoke defense of another because he provoked the fight with Brown.[17] In any event, as noted above, there was no evidence appellant provoked the fight. The error was harmless. (See *People v. Cross* (2008) 45 Cal.4th 58, 67 ["giving an irrelevant or inapplicable instruction is generally ' "only a technical error which does not constitute ground for reversal" ' "].)

IV. *Excluded Photographs*

Appellant argues the trial court erred in excluding photographs taken by Rossetter, the defense expert, showing (1) measurements of a man designated as a stand in for the victim, (2) a laser pointing to the bullet strike mark on the eleventh step of the unit 930 stairs, and (3) different angles of a man standing on the stairs with a laser striking him in

---

[16] Because of this conclusion, we need not decide whether the instruction misstates the law, as appellant contends.

[17] The instruction's language applied only to self-defense, rendering it even less applicable to appellant's case.

the lower back.[18] The trial court found the photographs "misleading," "confusing for the jury," and "unduly suggestive, given the fact that there is not evidence to support this particular positioning gait and suggestiveness as to speed."

The parties disagree on the basis for the trial court's ruling and whether the exclusion was error. We need not decide either of these issues because any error was harmless. Rossetter's opinion as to where appellant and Brown could have been standing was thoroughly explained to the jury in his testimony and in computerized diagrams. It is not reasonably probable that the addition of photographs demonstrating his theory would have resulted in a more favorable verdict. (*Watson, supra,* 46 Cal.2d at p. 836.) We reject appellant's contention that the exclusion of the photographs violated his federal constitutional right to present a defense. Where, as here, " ' "there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense," ' " due process is not violated. (*People v. Boyette* (2002) 29 Cal.4th 381, 428 (*Boyette*); accord, *People v. Thornton* (2007) 41 Cal.4th 391, 452–453 ["short of a total preclusion of defendant's ability to present a mitigating case to the trier of fact, no due process violation occurs"].)

V. *Excluded Evidence of Brown's Prior Acts of Violence*

Appellant argues the trial court erred in excluding, pursuant to Evidence Code section 352, eight prior acts of violence committed by Brown. As set forth in the factual background, the trial court permitted appellant to introduce evidence of three of Brown's prior acts: placing Mixon in a headlock in 2011, threatening a BART agent in 2011, and placing a previous girlfriend in a headlock and slapping her friend in 2004.

The first evidence excluded by the trial court was that in 2010, Brown started a fight with Randy Oliver because of an argument Oliver had with Mixon, and Brown threatened to have his associates shoot Oliver. Mixon's version of this incident was substantially different from Oliver's: she stated that after Oliver and Mixon argued,

---

[18] Rossetter was allowed to show the jury computer-generated diagrams illustrating his theories.

17

Oliver assaulted Brown without any provocation from Brown. The trial court ruled that, because of the conflicting versions of the incident, the testimony would be too confusing and the confusion was not outweighed by the evidence's probative value because the incident was not substantially similar to the facts of the instant case.

Appellant also sought to introduce evidence that in 2008, while intoxicated, Brown had threatened a woman on BART, saying he would "fuck her in the ear." Appellant intended to present this evidence through a witness who saw an altercation between Brown and the woman and an officer to whom the woman made a statement. The trial court concluded the proffered evidence would confuse the issues before the jury and this confusion was not outweighed by its probative value.

Appellant sought to introduce evidence that in 2001, Brown was arrested after hitting a woman while she was driving and threatening to kill her if she went to the police; in 2000, Brown punched his then-girlfriend in the face, pushed her to the ground, and threatened to kill her and dump her body; in 2000, after Brown was arrested for driving under the influence, he spit at and threatened the arresting officers; in 1997, Brown assaulted a cab driver, then threatened and battered responding officers; in 1996, Brown hit, threatened, and beat a pedestrian for no reason; and as a juvenile, Brown had contacts for robbery and resisting arrest. The trial court found these incidents "cumulative" and "too remote."

" 'It has long been recognized that where self-defense is raised in a homicide case, evidence of the aggressive and violent character of the victim is admissible.' " (*People v. Wright* (1985) 39 Cal.3d 576, 587; see also Evid. Code, § 1103, subd. (1)(a).) However, " 'a defendant's evidence of self-defense is subject to all the normal evidentiary rules, including Evidence Code sections 350 [only relevant evidence is admissible] and 352.' " (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070.)

The trial court permitted appellant to present evidence of three prior incidents showing Brown's violent character. The trial court's exclusion of the additional evidence as confusing, cumulative, and/or remote was not an abuse of discretion. (*People v. Shoemaker* (1982) 135 Cal.App.3d 442, 449-450 [no abuse of discretion to exclude

additional evidence of victim's violent acts where "jury had already been presented with ample evidence of [victim's] character for violence"]; *People v. Gonzales* (1967) 66 Cal.2d 482, 500 [no abuse of discretion when trial court excluded as too remote seven-year-old evidence of the victim's violent character in a self-defense case].)[19] Moreover, the exclusion of this evidence did not violate appellant's federal constitutional right to present a defense. (*Boyette, supra,* 29 Cal.4th at p. 428 [no due process violation where " ' "there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense" ' "].)

VI. *Cumulative Error*

Appellant argued the cumulative error deprived him of the right to a fair trial. We disagree. We have either rejected appellant's claims of error or found that any errors, assumed or not, were harmless. "Viewed as a whole, such errors do not warrant reversal of the judgment." (*People v. Stitely* (2005) 35 Cal.4th 514, 560.)

DISPOSITION

The judgment is affirmed.

---

[19] Appellant's citation to cases in which courts affirmed the inclusion of prior act evidence older than seven years old does not deprive the trial court in this case of discretion to exclude such evidence.

_____

SIMONS, J.

We concur.

_____

JONES, P.J.

_____

BRUINIERS, J.

(A139538)

20

Superior Court of the City and County of San Francisco, No. SCN 215038, Hon. Kathleen Kelly, Judge.

Jennifer Peabody, Corona & Peabody, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, René A. Chacón and Bruce Ortega, Deputy Attorneys General, for Plaintiff and Respondent.