IN THE SUPREME COURT OF NORTH CAROLINA

No. 103PA24

Filed 12 December 2025

STATE OF NORTH CAROLINA

v.

GEORGE LEE ALLISON

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous, unpublished decision of the Court of Appeals, No. COA23-635 (N.C. Ct. App. Mar. 19, 2024), finding no error after appeal from a judgment entered on 28 October 2022 by Judge Jacqueline D. Grant in Superior Court, Burke County. Heard in the Supreme Court on 22 April 2025.

*Jeff Jackson, Attorney General, by Michael T. Henry, Special Deputy Attorney General, for the State-appellee.*

*Craig M. Cooley for defendant-appellant.*

BERGER, Justice.

It is undisputed that defendant shot and killed Brandon Adams on 13 December 2020 while Adams was standing in the doorway outside of defendant's residence. The question presented here is whether the jury was properly instructed on the castle doctrine as established by the legislature in N.C.G.S. § 14-51.2.

## I.    Factual and Procedural Background

A Burke County jury convicted defendant of second-degree murder, and he was

sentenced to 144 to 185 months in prison. The evidence at trial tended to show the following.[1]

On the day he was killed, Adams and his girlfriend, Pamela Rodgers, got into an argument. Adams told Rodgers he was going to defendant's home, but when he returned, Rodgers accused Adams of cheating on her. Adams told Rodgers to go to defendant's home to verify that he had in fact been there.

Rodgers drove to defendant's home, and defendant confirmed that Adams had been at his home. Thereafter, Rodgers and defendant began drinking bourbon, and Rodgers told defendant that Adams was mean to her and physically abusive. Defendant told Rodgers that she needed to leave and "go somewhere away from [Adams] if that's the case."

Later, Adams arrived at defendant's home, and defendant invited him inside. When Adams entered the home, he "started pointing at" Rodgers, and "[e]very time he would point, she would flinch" and "physically would draw back." After a few minutes, defendant asked Adams to leave. When Adams walked to the door, he rammed his shoulder into defendant's shoulder. Defendant testified that when he looked at Adams, he "did not see the person that [he] knew in those eyes."

Rodgers stayed in defendant's home and continued drinking after Adams left.

---

[1] As this case requires us to determine whether defendant was entitled to certain jury instructions, we recite the evidence in the light most favorable to defendant. *See State v. Mash*, 323 N.C. 339, 348 (1988) ("When determining whether the evidence is sufficient to entitle a defendant to jury instructions on a defense or mitigating factor, courts must consider the evidence in the light most favorable to defendant.").

Over the course of approximately two hours, Adams texted Rodgers multiple times, and Rodgers read the texts to defendant. In two texts sent at 8:41 p.m., Adams stated, "If I come down there I'm telling you it's going to get bad," and "I will drag him outside and beat the fuck out of him."

Eventually, Rodgers told defendant she was going to return to Adams' home but needed defendant to drive her because she was intoxicated. Defendant asked Rodgers to wait in his home while he went to the grocery store to pick up items for his mother, who suffered from Alzheimer's and lived with defendant. Defendant drove to the grocery store, but he returned home upon realizing that he had left his wallet. Defendant then went to withdraw cash from an ATM, but then he decided not to go to the grocery store.

Defendant's route home traveled past Adams' home, and when Adams saw defendant drive past, he pulled his vehicle in behind defendant, got "right on [defendant's] tail" and "slid in" behind defendant when he parked. Adams and defendant both exited their vehicles, and Adams told defendant, "You are going to have to kill me to keep me from dragging that fucking bitch out of your house." Defendant ran to his home, quickly opened the door, and Adams "stuck his hand and his foot" inside the door, preventing defendant from closing it.

Defendant pushed to close the door, Adams pushed back, and defendant realized he "wasn't winning this one" because Adams "had more strength than [defendant] did." Defendant let go of the door, retrieved a shotgun, and returned to

the front door. He "presented the weapon" to Adams, who remained on the home's front porch directly outside the front door, and defendant "begged" Adams to "please just go home, don't come back, just go home" because Rodgers was "going to be leaving [t]here in a minute." Defendant asked Adams to let him lock the door and help his mother go to bed so that he could then allow Adams to come in and talk to Rodgers.

Adams "wasn't having it" and was "staying right there," and defendant told him, "I am going to countdown, and then you leave." Adams did not leave, so defendant counted down from seven to zero, then five to zero, and finally three to zero. At that point, defendant turned to look at his mother, who was sitting inside the home, and when he turned back, he saw Adams make a forward movement. Defendant testified that when he saw Adams make this movement, he "could have swore there was a bolt of light[ning] that ran through [his] body," and he "just reacted" by pulling the trigger and shooting Adams.

Rodgers called 911, and though Adams was alive when law enforcement arrived at the scene, he later died from the gunshot wound. Defendant was arrested, and he was subsequently indicted for first-degree murder.

Defendant's matter came on for trial on 24 October 2022, and he presented a castle doctrine defense under N.C.G.S. § 14-51.2. Rodgers testified for the State that when defendant and Adams arrived at the home, defendant entered and told Adams not to cross the threshold. Adams, who was neither aggressive nor violent, replied that he would not enter the home and, according to Rodgers, never attempted to do

so. Defendant immediately retrieved his shotgun. According to Rodgers, defendant returned, pointed the gun at Adams, and counted down three times before pulling the trigger. The State argued that defendant was not entitled to the castle doctrine defense because Adams did not physically enter defendant's home. The trial court denied defendant's motion to dismiss but granted his request to provide the pattern jury instruction for defense of habitation under the statute.

The relevant portion of the trial court's instruction to the jury on this issue was as follows:

> If the defendant killed the victim to prevent a forcible entry into the defendant's home, or to terminate the intruder's unlawful entry, the defendant's actions are excused and the defendant is not guilty. The State has the burden of proving from the evidence beyond a reasonable doubt that the defendant did not act in the lawful defense of the defendant's home.
>
> The defendant was justified in using deadly force if such force was being used to prevent a forcible entry or terminate the intruder's unlawful entry into the defendant's home, the defendant reasonably believed that the [intruder] would kill or inflict serious bodily harm to the defendant or others in the home, and the defendant reasonably believed that the degree of force the defendant used was necessary to prevent a forcible entry or terminate the intruder's unlawful entry into the defendant's home.
>
> A lawful occupant within a home does not have a duty to retreat from an intruder in these circumstances. Furthermore, a person who unlawfully and by force enters or attempts to enter a person's home is presumed to be doing so with the intent to commit an unlawful act involving force or violence. In addition, absent evidence to the contrary, the lawful occupant of a home is presumed to have held a reasonable fear of imminent death or serious

bodily harm to himself or another when using defensive force that is intended or likely to cause death or serious bodily harm to another if both of the following apply:

The person against whom the defensive force was used was in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered a home, or if that person had removed or was attempting to remove another against that person's will from the home; and second, that the person who uses defensive force knew or had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring or had occurred. It is for you, the jury, to determine the reasonableness of the defendant's belief from the circumstances as they appeared to the defendant at the time.

. . . .

If you find beyond a reasonable doubt that the defendant killed the victim, you may return a verdict of guilty only if the State has satisfied you beyond a reasonable doubt that the defendant did not act in the lawful defense of the defendant's home; that is, that the defendant did not use such force to prevent a forcible entry or terminate the intruder[']s unlawful entry into the defendant's home, that the defendant did not reasonably believe the intruder would kill or inflict serious bodily harm to the defendant or others in his home, and that the defendant did not reasonably believe that the degree of force the defendant used was necessary to prevent a forcible entry or terminate the intruder's unlawful entry into the defendant's home.

The trial court did not instruct the jury that the curtilage of a home constitutes part of the home for defense of habitation purposes. *See* N.C.G.S. § 14-51.2(a)(1) (2023). Based on these instructions, the jury convicted defendant of second-degree murder, and the trial court sentenced defendant to 144 to 185 months incarceration. Defendant appealed.

At the Court of Appeals, defendant argued the trial court erred in denying his motion to dismiss and plainly erred in providing the jury with a deficient instruction on the castle doctrine. *State v. Allison*, No. COA23-635, 2024 WL 1173544, at *1–2 (N.C. Ct. App. Mar. 19, 2024). The Court of Appeals held the trial court did not err in denying defendant's motion to dismiss because the State "presented substantial evidence to rebut the presumption created by the castle doctrine." *Id.* In addition, relying on its own precedent in *State v. Austin*, 279 N.C. App. 377 (2021), the Court of Appeals rejected defendant's jury instruction argument because "the State presented substantial evidence that [d]efendant did not have a reasonable fear of imminent death or bodily harm, thus overcoming the reasonableness presumption and creating a question of fact for the jury to decide." *Allison*, 2024 WL 1173544, at *2.

Defendant filed a notice of appeal based upon a constitutional question and a petition for discretionary review with this Court. On 13 December 2024, this Court dismissed defendant's notice of appeal ex mero motu and allowed his petition for discretionary review to address a single issue:

> When the General Assembly enacted the castle doctrine statute, particularly N.C.G.S. § 14-51.2(c)—which identifies five circumstances where the presumption of reasonableness can be rebutted, whether § 14-51.2(c) contains an unwritten sixth exception that states the reasonableness presumption can also be rebutted if:
>
>> The State presents substantial evidence from which a reasonable juror could conclude that a defendant did not have a reasonable fear of

imminent death or serious bodily harm, the State can overcome the presumption and create a fact question for the jury.

## II.    Standard of Review

"We examine de novo whether a jury instruction correctly explains the law." *State v. Copley*, 386 N.C. 111, 119 (2024) (cleaned up).  As defendant failed to object to the trial court's instructions, we review for plain error and examine whether defendant has demonstrated that: (1) a fundamental error occurred at trial, (2) such error had a probable impact on the outcome, and (3) the error is an exceptional case warranting plain error review.  *See State v. Reber*, 386 N.C. 153, 158 (2024).

## III.    Discussion

### A. The Castle Doctrine

In 2011, the General Assembly enacted a detailed statutory scheme "that expanded and clarified use of force protections" and prioritized the rights of lawful occupants of homes, automobiles, and businesses.  *State v. Phillips*, 386 N.C. 513, 520 (2024) (citing An Act to Provide When a Person May Use Defensive Force and to Amend Various Laws Regarding the Right to Own, Possess, or Carry a Firearm in North Carolina, S.L. 2011-268, § 2, 2011 N.C. Sess. Laws 1002, 1004).  The castle doctrine in North Carolina recognizes that unlawful intruders create an inherently dangerous situation in certain specified circumstances, and lawful occupants are thus given the benefit of the doubt in qualifying use of force scenarios.

Under these statutes, "a person is justified in the use of deadly force and does

not have a duty to retreat in any place he or she has the lawful right to be if," applicable here, N.C.G.S. § 14-51.2 is satisfied. N.C.G.S. § 14-51.3(a) (2023). Under that provision, lawful occupants of homes, vehicles, and workplaces may use force, including deadly force, against unlawful intruders. *Id.* The statute specifically defines a "home" as a "building or conveyance of any kind, to include its curtilage, whether the building or conveyance is temporary or permanent, mobile or immobile, which has a roof over it, including a tent, and is designed as a temporary or permanent residence." N.C.G.S. § 14-51.2(a)(1). The doctrine functions as follows:

> First, any person who unlawfully and by force enters or attempts to enter a home is presumed to be doing so with the intent to commit an unlawful act involving force or violence, and this presumption is non-rebuttable. Second, a lawful occupant of a home who knows or has reason to believe such unlawful entry or attempted entry occurred or is occurring, and who uses force against the intruder that is intended or likely to cause death or serious bodily, is presumed to have held a reasonable fear of imminent death or serious bodily harm and has no duty to retreat from the intruder. Finally, if a lawful occupant of a home uses deadly force as permitted by this statute, he or she is immune from civil or criminal liability for the use of such force, subject only to a narrow exception not relevant here.

*Phillips*, 386 N.C. at 524 (cleaned up).

Thus, although the common law and the stand your ground statute in subsection 14-51.3(a)(1) generally require individuals who use deadly force against another to demonstrate his or her reasonable belief that such force was necessary to prevent imminent death or great bodily harm, the castle doctrine does not require a lawful occupant of a home to make such a showing. N.C.G.S. § 14-51.2;

*see also* N.C.G.S. § 14-51.3(a)(2). Instead, when the specific statutory criteria of section 14-51.2 are met, the General Assembly has plainly stated that such individual is "presumed to have held a reasonable fear of imminent death or serious bodily harm to himself or herself or another." N.C.G.S. § 14-51.2(b) (2023).

This presumption, however, is rebuttable and does not apply if at least one of the following scenarios is applicable:

> (1) The person against whom the defensive force is used has the right to be in or is a lawful resident of the home, motor vehicle, or workplace, such as an owner or lessee, and there is not an injunction for protection from domestic violence or a written pretrial supervision order of no contact against that person.
>
> (2) The person sought to be removed from the home, motor vehicle, or workplace is a child or grandchild or is otherwise in the lawful custody or under the lawful guardianship of the person against whom the defensive force is used.
>
> (3) The person who uses defensive force is engaged in, attempting to escape from, or using the home, motor vehicle, or workplace to further any criminal offense that involves the use or threat of physical force or violence against any individual.
>
> (4) The person against whom the defensive force is used is a law enforcement officer or bail bondsman who enters or attempts to enter a home, motor vehicle, or workplace in the lawful performance of his or her official duties, and the officer or bail bondsman identified himself or herself in accordance with any applicable law or the person using force knew or reasonably should have known that the person entering or attempting to enter was a law enforcement officer or bail bondsman in the lawful performance of his or her official duties.

(5) The person against whom the defensive force is used (i) has discontinued all efforts to unlawfully and forcefully enter the home, motor vehicle, or workplace and (ii) has exited the home, motor vehicle, or workplace.

N.C.G.S. § 14-51.2(c).

This Court recently took "the opportunity to clarify the castle doctrine as established by the legislature." *Phillips*, 386 N.C. at 514. We expressly held that "the castle doctrine's statutory presumption of reasonable fear may only be rebutted by the circumstances contained in section 14-51.2(c)." *Id.* at 525. We also held that excessive force is a legal impossibility unless that presumption had been rebutted and provided an outline of the proper decision tree to be applied when presented with a castle doctrine defense.

> [W]hen a defendant asserts the castle doctrine defense at trial, the jury must first determine whether the defendant is entitled to the presumption [of reasonable fear] as set forth in section 14-51.2(b). If the jury finds that the defendant is not entitled to the presumption, the castle doctrine statute does not apply and the jury must determine the defendant's culpability under section 14-51.3, the general self-defense statute.
>
> Alternatively, if the jury finds that the defendant is entitled to the presumption, it must then determine whether the State has rebutted the presumption by proving any of the circumstances set forth in section 14-51.2(c). If the jury finds that the State has rebutted the presumption, the jury must determine whether the defendant's use of force was proportional. However, if the jury finds that the State failed to rebut the presumption, the defendant *must* be acquitted in accordance with section 14-51.2(e).

*Id.*

Here, defendant's trial and the Court of Appeals' opinion predated our decision in *Phillips*. The Court of Appeals therefore relied on its erroneous precedent to reject defendant's argument that the trial court plainly erred by instructing the jury that it could consider evidence concerning the presumption of reasonable fear and the reasonableness of force used. *See Allison*, 2024 WL 1173544, at *1–2.

The State now argues that the Court of Appeals' reasoning survives *Phillips* because this Court did not explicitly overrule the Court of Appeals' precedent when we held "that the castle doctrine's statutory presumption of reasonable fear may *only* be rebutted by the circumstances contained in section 14-51.2(c)." *Phillips*, 386 N.C. at 525 (emphasis added). According to the State, this Court's "discussion of section 14-51.2(c) in *Phillips* is non-binding dicta" because it was unnecessary to the resolution of the issue presented in that case.

But the question in *Phillips* was whether "the castle doctrine statute preserves the common law's prohibition on excessive force." *Id.* at 517. This Court clearly stated, "[t]o resolve this case, we must therefore examine what is permitted under the castle doctrine." *Id.* at 521. We ultimately concluded that excessive force was not a proper consideration where "a lawful occupant of a home is cloaked with the protections afforded by the castle doctrine and the State fails to rebut the statutory presumption that the lawful occupant had reasonable fear." *Id.* at 527. In other words, whether the jury could consider the proportionality of a defendant's use of

force turns on whether "the jury finds that the State has rebutted the presumption." *Id.* at 525. Determining the scope of the State's ability to rebut the statutory presumption of reasonable fear, that is, interpreting subsection 14-51.2(c), was therefore at the heart of resolving whether "the castle doctrine statute preserves the common law's prohibition on excessive force." *Id.* at 517.

In addition to misapprehending subsection 14-51.2(c)'s necessity to our decision in *Phillips*, the State's contention that the Court of Appeals' precedent to the contrary survived that decision belies fundamental principles of jurisprudence. When this Court, which has the final say on matters of state law, announces a rule of law or an interpretation of a statute, it is controlling, and any contrary holding of a lower court is superseded. *See State v. Tirado*, 387 N.C. 104, 112 (2025) (only the Supreme Court of North Carolina may answer "questions [of state law] with finality[.]"); *Hart v. State*, 368 N.C. 122, 130 (2015) ("As the court of last resort in this state, we answer with finality issues concerning the proper construction and application of North Carolina laws and the Constitution of North Carolina." (cleaned up)).

Under the backdrop of our decision in *Phillips*, the question presented here, whether the presumption of reasonable fear can be rebutted by evidence of circumstances beyond the five circumstances listed in subsection 14-51.2(c), was resolved unanimously by this Court: the presumption "may only be rebutted by the circumstances contained in section 14-51.2(c)." *See Phillips*, 386 N.C. at 525; *id.* at

531 (Earls, J., with Riggs, J., concurring in part and dissenting in part) (concurring as to the Court's interpretation of section 14-51.2 and only "part[ing] ways with the majority on" this Court's decision to remand the question of prejudice to the Court of Appeals).

## B. Jury Instructions

"It is fundamental that a jury must be properly instructed on the law." *Phillips*, 386 N.C. at 525 (majority opinion). "A defendant entitled to *any* self-defense instruction is entitled to a *complete* self-defense instruction . . . ." *State v. Coley*, 375 N.C. 156, 159–60 (2020) (cleaned up). "Instructions that provide jurors with a clear decision tree are critical for a jury to be able to accurately determine whether the presumptions provided by § 14-51.2 have been rebutted. A jury must intentionally and methodically determine whether that presumption has been rebutted." *Copley*, 386 N.C. at 126–27 (Barringer, J., concurring).

Here, the jury instructions on the castle doctrine, which were crafted prior to *Phillips*, failed to properly inform the jury of the applicable law in several ways.[2] Specifically, the jury was instructed that defendant would be justified in using deadly

---

[2] Defendant was tried and convicted in October 2022, almost two years before this Court's opinion in *Phillips* was issued on 23 August 2024. Thus, there is no way the trial court's instructions below could have complied with the decision tree we laid out in *Phillips*. This will be true for a number of cases in the appellate pipeline. But to be clear, we understand that the very capable members of the Pattern Jury Instruction Committee read our opinions and take seriously their obligation to ensure the instructions align with the law. These things take time, and it is more important that the committee gets it right rather than simply getting it done.

force only if: (1) he reasonably believed Adams would kill or inflict serious bodily harm to defendant or others in the home, and (2) he reasonably believed such force was necessary to prevent or terminate Adams' unlawful entry into the home. Though the jury was instructed defendant was presumed to have held a reasonable fear of imminent death or serious bodily harm, it was also instructed that such presumption could be rebutted by any evidence to the contrary and that it was ultimately the jury's responsibility to determine the reasonableness of defendant's belief. In addition, the jury was not instructed that a home's curtilage is a protected location under the express language of section 14-51.2. These portions of the jury instructions, as we stated in *Phillips*, are fundamentally incompatible with the statute and therefore fail to accurately instruct on the law.[3]

First, when an intruder "unlawfully and by force enters or attempts to enter" a person's home or its curtilage, the General Assembly has expressly removed from the province of the jury questions regarding the reasonableness of a lawful occupant's belief that such intruder intends "to commit an unlawful act involving force or violence." N.C.G.S. § 14-51.2(d). No jury instruction on the castle doctrine should

---

[3] The State argues defendant cannot now complain of these instructions as he requested the pattern jury instructions on defense of habitation. However, because the State did not raise this argument at the Court of Appeals, it is not preserved for our consideration. *See Falls Sales Co. v. Bd. of Transp.*, 292 N.C. 437, 443 (1977) ("The potential scope of our review is limited by the questions properly presented for first review in the Court of Appeals. The attempt to smuggle in new questions is not approved." (cleaned up)). Defendant's argument regarding a pretrial determination of immunity suffers from the same defect, and we decline to consider both arguments.

invite the jury to address this question. Rather, the instruction should simply ask the jury whether the intruder had unlawfully and by force entered or attempted to enter the protected location and whether the defendant was a lawful occupant of such location at the time of the unlawful entry. If the jury answers these questions in the affirmative, then the non-rebuttable presumption that the victim intended to commit an unlawful act involving force or violence applies and the jury may not be instructed to the contrary.

Second, if an unlawful and forceful entry or attempted entry occurred, and if the lawful occupant knew or had reason to believe that such entry or attempted entry occurred, the lawful occupant "is presumed to have held a reasonable fear of imminent death or serious bodily harm to himself or herself or another when using defensive force that is intended or likely to cause death or serious bodily harm to another." N.C.G.S. § 14-51.2(b). The jury may consider whether that presumption has been rebutted if, and only if, the State presents evidence tending to establish one of the five circumstances listed in subsections 14-51.2(c)(1)–(5). In that case, the jury must be specifically instructed that it may only consider the reasonableness of the defendant's belief if it affirmatively finds that the State has proven the circumstance or circumstances beyond a reasonable doubt. If instead, as in this case, the State fails to present any evidence tending to establish one of those five circumstances, then the General Assembly has expressly removed from the province of the jury any question regarding the reasonableness of, or even the existence of, the defendant's fear of

imminent death or serious bodily harm.

Third, a natural consequence of the presumption of fear of imminent death or serious bodily harm is that unless such presumption is rebutted, "excessive force is impossible" under the castle doctrine. *Phillips*, 386 N.C. at 527 (cleaned up). In other words, if, as in this case, the State fails to present any evidence establishing one of the five circumstances in subsection (c), the jury may not consider whether the defendant reasonably believed the degree of force used was necessary to prevent a forcible entry or to terminate such unlawful entry.

Finally, the castle doctrine statute specifically affords protection to a lawful occupant of a home, motor vehicle, or workplace. The statute defines a "home" as a "building or conveyance of any kind, to include its curtilage, whether the building or conveyance is temporary or permanent, mobile or immobile, which has a roof over it, including a tent, and is designed as a temporary or permanent residence." N.C.G.S. § 14-51.2(a)(1). The State argued at trial that the defense does not apply to the curtilage, but the plain language of the statute extends the castle doctrine's protections beyond a home's four walls.

However, because defendant failed to object to these instructions at trial, to receive relief he must demonstrate plain error. In reviewing for plain error, we examine whether defendant has shown that: (1) a fundamental error occurred at trial, (2) such error had a probable impact on the outcome, and (3) the error is an exceptional case warranting plain error review. *Reber*, 386 N.C. at 158.

Here, the instructional errors discussed above deprived defendant of his entitlement to "a *complete* self-defense instruction." *See Coley*, 375 N.C. at 159–60 (cleaned up). The "jury instructions [were] infected with legal error," *Copley*, 386 N.C. at 125, and rise to the level of fundamental error, i.e., a "grave error which amounts to a denial of a fundamental right of the accused," *Reber*, 386 N.C. at 158 (cleaned up).

The castle doctrine provides immunity from criminal and civil liability for qualifying occupants, and the erroneous instructions here foreclosed defendant's ability to argue, or that the jury could consider, that his actions were legally protected under the statute. Unlike many instructional errors, the failure to properly instruct the jury on the castle doctrine wholly eliminated consideration of lawful conduct. This amounts to the denial of a fundamental right.

The second prong of plain error, the prejudice prong, requires us to determine whether defendant has shown this fundamental error had a probable impact on the trial's outcome. "[T]his standard—showing that a jury *probably would have* reached a different result—requires a showing that the outcome is significantly more likely than not." *Id.* at 159. "[A]n event will 'probably' occur if it is 'almost certainly' the expected outcome; it is treated as synonymous with words such as 'presumably' and 'doubtless.' " *Id.* (first quoting *Probably*, New Oxford American Dictionary (3d ed. 2010); and then quoting *Probably*, Merriam-Webster's Collegiate Dictionary (11th ed. 2007)).

Here, the jury was improperly instructed that it could only find defendant acted lawfully under the castle doctrine if defendant reasonably believed that: (1) Adams would kill or inflict serious bodily harm to defendant or others, and (2) the degree of force he used was reasonably necessary to prevent or terminate an unlawful entry. Under the facts of this case and our precedent in *Phillips*, neither of these questions were proper.

The State argues that because "the jury's verdict [of second-degree murder] strongly suggests it credited [Rodger's] account, wherein no forcible entry occurred," the failure to properly instruct on the castle doctrine's presumptions and scope could not "probably" have affected the outcome at trial. Although Rodgers testified that Adams never entered defendant's home and she never heard defendant ask Adams to leave the porch, she also testified that defendant warned Adams not to cross the threshold and counted down to zero multiple times before shooting him. Thus, even if the jury entirely credited Rodger's testimony over defendant's, her testimony alone provides some evidence that Adams unlawfully entered the curtilage of defendant's home and that he had not ceased such entry prior to defendant's use of force.

Though the enactment of the castle doctrine statute abrogated the common law, it did not alter the principle that the "burden is upon the State to prove beyond a reasonable doubt that the defendant did not act in self-defense when there is some evidence in the case that he did." *State v. Herbin*, 298 N.C. 441, 445 (1979); *see also* N.C.G.S. § 14-51.2(g) (providing that the castle doctrine statute "is not intended to

repeal or limit any other defense that may exist under the common law"). The record demonstrates that there was some evidence of an unlawful and forceful entry, or an unlawful and forceful attempted entry, upon the premises by Adams. But there is no information in the record that the jury determined beyond a reasonable doubt that no such entry or attempted entry occurred. Considering the instructional error in this case, including the failure to inform the jury of the curtilage's protected status, we reject the State's invitation to impute this finding to an otherwise silent verdict sheet.

If a properly instructed jury found that Adams unlawfully and forcibly entered or attempted to enter the home's curtilage and that defendant knew or had reason to believe such entry or attempted entry occurred, then the castle doctrine's mandatory presumptions would apply. The jury would therefore not consider whether defendant reasonably believed Adams entered the curtilage with the "intent to commit an unlawful act involving force or violence." *See* N.C.G.S. § 14-51.2(d). Nor would it consider whether defendant "held a reasonable fear of imminent death or serious bodily harm to himself . . . or another when using defensive force that is intended or likely to cause death or serious bodily harm to another," *see* N.C.G.S. § 14-51.2(b), because the State failed to prove any of the circumstances rebutting this presumption beyond a reasonable doubt. Such a properly instructed jury would not only *probably* return a different verdict, it would almost *certainly* return a different verdict because an individual who uses deadly force under these circumstances "is justified in using

such force and is immune from civil or criminal liability for the use of such force," subject to but one exception not relevant here. *See* N.C.G.S. § 14-51.2(e).

Having concluded that defendant has established both that a fundamental error occurred at trial and that the error had a probable impact on the trial's outcome, we must now determine whether defendant has shown that this is the "exceptional case that . . . seriously affects the fairness, integrity or public reputation of judicial proceedings." *See Reber*, 386 N.C. at 158 (cleaned up). We agree with defendant that the erroneous instructions here probably led the jury to base its second-degree murder verdict "on conduct the General Assembly deemed justifiable and legal." Because such criminal convictions based on lawful conduct are abhorrent to the principles of fairness inherent in our judicial system, we are satisfied that defendant's matter is the exceptional case irreparably tainted by plain error. Accordingly, we reverse the Court of Appeals' judgment and remand this matter for a new trial.

## IV. Conclusion

Where there is evidence supporting a jury instruction on the castle doctrine, a defendant is entitled to receive the full benefit of that instruction. When a jury is improperly instructed on this defense, the defendant faces the intolerable prospect of conviction based on conduct our General Assembly has deemed lawful and justified. Because the erroneous instructions in this case probably resulted in defendant's conviction rather than acquittal, we reverse the Court of Appeals' judgment.

REVERSED AND REMANDED.

Justice RIGGS dissenting.

At the core of the question presented in this case—whether the jury was properly instructed on the castle doctrine as established in N.C.G.S. § 14-51.2—is whether the castle doctrine's presumption of reasonable fear may be rebutted only by the five statutory exceptions to the presumption outlined in subsection (c) of the castle doctrine statute. *See* N.C.G.S. § 14-51.2(c) (2023) ("The presumption set forth in subsection (b) of this section shall be rebuttable and does not apply in any of the following [five] circumstances . . . ."). The majority, relying on nonbinding statements, or dicta, in *State v. Phillips*, 386 N.C. 513 (2024), formally limits the refutability of the presumption to only those five circumstances. Because I would hold that the majority's reliance on nonbinding dicta in *Phillips* is misguided and that the plain language of the castle doctrine statute does not limit rebutting the presumption of reasonable fear to the five circumstances in the castle doctrine statute, I respectfully dissent.

The concurrence in *Phillips*, which I joined, explained the path that jurors should take as they apply the castle doctrine, but it did not adopt nor suggest that the five exceptions are the *only* possibilities for rebutting the presumption of reasonable fear. *Phillips*, 386 N.C. at 529 (Earls, J., concurring in part and dissenting in part). The concurrence acknowledged, as the *Phillips* majority did, that the castle doctrine statute creates a reasonable presumption of fear provided that the

prerequisites outlined in subsection 14-51.2(b) are met, entitling a criminal defendant to complete jury instructions that inform jurors of the use of lawful force and gives them a clear decision tree for examining it. *Id.* at 530; *see also* N.C.G.S. § 14-51.2(b) (2023). But the majority also affirmed that the castle doctrine is not a "license to kill," meaning that there are limits to the castle doctrine's protections. *See Phillips*, 386 N.C. at 525 ("The expansive protections afforded to lawful occupants of a home does not mean that the castle doctrine is 'a license to kill' or that the statute allows for 'open season on Girl Scouts and trick-or-treaters.' " (quoting *State v. Copley*, 386 N.C. 111, 123 (2024))). The castle doctrine statute uses a burden-shifting provision, creating a presumption in favor of the defendant that, per subsection 14-51.2(c), the State is entitled to rebut. *See* N.C.G.S. § 14-51.2(c) (providing that the presumption of a lawful occupant's reasonable fear of death or serious bodily harm is "rebuttable and does not apply in any of the . . . circumstances" listed in subsection (c)); *Copley*, 386 N.C. at 122. For example, in discussing the implicit limits of the castle doctrine, the concurrence explained that jurors must first consider any evidence of entry being lawful or unforceful, such as when a person is conducting door-to-door sales, delivering packages or mail, or accepting the homeowner's invitation to enter the property. *See Phillips*, 386 N.C. at 530 (Earls, J., concurring in part and dissenting in part). If jurors conclude an entry was "unlawful[ ] and forceful[ ]" as required by subsection 14-51.2(b), that is what triggers the presumption of reasonableness. *Id.*; *see also* N.C.G.S. § 14-51.2(b).

The next step for jurors would then be to consider whether the State rebutted the presumption in accordance with N.C.G.S. § 14-51.2(c). In *Phillips*, the issue was whether the jury instructions failed to accurately explain the law, preventing the jurors from assessing the legality of the defendant's use of force. *Phillips*, 386 N.C. at 528 (majority opinion); *see also id.* at 531 (Earls, J., concurring in part and dissenting in part). That the *Phillips* majority provided a full background on the development and evolution of the castle doctrine in North Carolina to ultimately reach the conclusion that the jury instructions in *Phillips* were erroneous does not necessarily make the entirety of its statements binding, especially where the statements, though informative, were not determinative. That the concurrence agreed with the need for proper jury instructions in *Phillips* does not foreclose holding today that the castle doctrine's presumption of reasonableness is rebuttable beyond the five circumstances in the statute. Doing so is not a departure from the concurrence's position in *Phillips*; rather, it is an extension of the *Phillips* concurrence's interpretation that the castle doctrine, while broad when appropriately applied, still has necessary limits.

Language unnecessary to a court's decision is obiter dictum and not binding to subsequent decisions. *See, e.g.*, *Washburn v. Washburn*, 234 N.C. 370, 373 (1951) (holding that statements in the text of an opinion unnecessary to the determination of a case is obiter dicta). This Court's decision in *McKinney v. Goins*, 387 N.C. 35 (2025), is illustrative of this principle. There, this Court addressed a constitutional

challenge to legislation reviving expired tort claims. *Id.* at 41. The defendant argued that a "revival provision" violated vested rights and relied on prior decisions—particularly *Wilkes County v. Forester*, 204 N.C. 163 (1933), and *Jewell v. Price*, 264 N.C. 459 (1965)—to support the proposition that retroactive revival of time-barred claims is unconstitutional. *McKinney*, 387 N.C. at 46–47. The Court rejected this reading and held that the relevant language in both *Wilkes County* and *Jewell* was nonbinding dicta. *Id.* at 54–58.

In *Wilkes County*, although the Court included broad language asserting that reviving a time-barred claim would be unconstitutional because it impaired vested rights, the holding turned on the statutory text of a statute enacted in 1931. 204 N.C. at 168–69. The Court interpreted the plain language of the statute as not applying retroactively and decided the case on those grounds. *Id.* at 166–69. The subsequent constitutional commentary, including the statement that reviving a barred claim would be unconstitutional, was unnecessary to the resolution of the dispute. *See id.* at 170. Similarly, in *Jewell*, the Court ruled on statutory grounds, concluding that the statute extending the limitations period did not apply retroactively. *Jewell*, 264 N.C. at 461–63 (citing N.C.G.S. § 1-50). While the *Jewell* Court reiterated the language from *Wilkes County*, it did so hypothetically and noted that the plaintiffs had conceded the new statute did not govern. *See id.* at 461.

Much like in *Wilkes County* and *Jewell*, the language in *Phillips* regarding the castle doctrine was not necessary to the case's outcome or disposition. The dispositive

issue in *Phillips* was whether the trial court erred by instructing the jury to consider the proportionality of the defendant's use of force—even after finding that she was entitled to the castle doctrine's presumption of reasonableness. 386 N.C. at 517. This Court ultimately held that this instruction was erroneous because proportionality becomes relevant *only* if the State first rebuts the statutory presumption by proving one of the five exceptions listed in N.C.G.S. § 14-51.2(c). *Id.* at 525–26.

However, the Court's broader explanation of how the castle doctrine statute "operates"—including its step-by-step summary of subsections (b), (d), and (e)—was not essential to that holding. *Id.* at 524–25. For instance, the Court's description of subsection (d) as creating a "non-rebuttable" presumption regarding the intruder's intent, *id.* at 524, or its statement that immunity under subsection (e) attaches once subsection (b) applies, *id.* at 525, were neither contested nor required to resolve the jury instruction issue. Instead, those comments functioned as background exposition and statutory overview—language helpful for context but not critical to the outcome.

Furthermore, the *Phillips* Court's overview of the castle doctrine in North Carolina provides that the General Assembly intended to broaden the castle doctrine through its 2011 amendments. *Phillips*, 386 N.C. at 520. According to the majority in *Phillips* and here, the legislature did so by repealing N.C.G.S. § 14-51.1 and codifying N.C.G.S. §§ 14-51.2 and -51.3, and this change clarified when the use of deadly force is justified in self-defense or in defense of habitation (the castle doctrine). *Phillips*, 386 N.C. at 520; *see also State v. Austin*, 279 N.C. App. 377, 378 (2021). Another

expansion of the doctrine since 2011 is "the defendant no longer has the burden to prove key elements of the traditional self-defense doctrine." *Austin*, 279 N.C. App. at 380; *see also* N.C.G.S. § 14-51.2(f). These expansions do not compel, however, a conclusion that subsection (c) limits the rebuttable presumption to only the circumstances set forth in subsection (c) as the *Phillips* court extraneously declared. *Phillips*, 386 N.C. at 524.

Because the quoted statutory interpretation in *Phillips* was not necessary to resolve the precise legal question before the Court, it qualifies as nonbinding dicta. That the concurrence in Phillips did not quibble with irrelevant and nonbinding aspects of the majority there is of no import here: what matters is that dicta from *Phillips* now fully embraced in this case is incorrect.

Interpreting the castle doctrine's presumption of reasonableness as rebuttable only under the circumstances listed in subsection (c) of the castle doctrine statute also conflicts with longstanding principles of statutory construction. Statutory construction requires courts to "look first to the language of the statute itself." *Hieb v. Lowery*, 344 N.C. 403, 409 (1996). When the language of a statute is unambiguous, "there is no room for judicial construction and the courts must give [a statute] its plain and [ordinary] meaning." *State v. Camp*, 286 N.C. 148, 152 (1974) (quoting 7 Strong's, N.C. Index 2d, Statutes § 5 (1968)). But when a statute *is* ambiguous, then judicial construction must be used to determine the statute's legislative purpose. *Burgess v. Your House of Raleigh, Inc.*, 326 N.C. 205, 209 (1990). Determining that

purpose is found from the "language of the act [and] its legislative history." *State ex rel. N.C. Milk Comm'n v. Nat'l Food Stores, Inc.*, 270 N.C. 323, 332 (1967).

With these principles in mind, the castle doctrine statute clearly and unambiguously provides that the presumption of reasonableness afforded to a home's lawful occupant may be rebutted *beyond* the five circumstances in subsection (c). The relevant portions of the castle doctrine statute are as follows:

> (b) The lawful occupant of a home . . . is presumed to have held a reasonable fear of imminent death or serious bodily harm . . . when using defensive force that is intended or likely to cause death or serious bodily harm to another if both of the following apply:
>
> > (1) The person against whom the defensive force was used was in the process of unlawfully and forcefully entering . . . .
> >
> > (2) The person who uses defensive force knew or had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring or had occurred.
>
> (c) The presumption set forth in subsection (b) of this section *shall be rebuttable and does not apply in any* of the following circumstances . . . .

N.C.G.S. § 14-51.2(b)–(c) (emphasis added).

While subsection (c) lists five specific situations in which the presumption "does not apply," nothing in the statute's text expressly limits rebuttal of the presumption to only those five circumstances. *See* N.C.G.S. § 14-51.2(c). Subsection (c) states that the presumption "shall be rebuttable and does not apply in any of the following circumstances," but it does not say the presumption is rebuttable *only* in

those circumstances.  *See id*.  The legislature's use of the word "and"—a conjunction that functions to connect related but distinct ideas—supports this interpretation. *See And*, Merriam-Webster's Collegiate Dictionary (11th ed. 2007).  By stating that the presumption "shall be rebuttable and does not apply" in certain instances, the statute draws a distinction between (1) the general rebuttable nature of the presumption, and (2) specific situations where the presumption fails to arise in the first place.

Had the legislature intended to make the five exceptions in subsection (c) the only means by which the presumption may be overcome, it could have structured the provision differently—such as by stating, "The presumption shall only be rebuttable in the following circumstances."  Instead, it employed "shall be rebuttable" as a general directive and followed it with a nonexhaustive list of conditions under which the presumption does not apply *ab initio*.  *See* N.C.G.S. § 14-51.2(c).

When the legislature *has* intended to limit the rebuttal of a presumption to specific, enumerated grounds, *it has done so expressly*.  For example, in N.C.G.S. § 113-421, which governs presumptive liability for water contamination in oil and gas development, the statute provides that the presumption of contamination is rebuttable only through a limited number of defenses.  It explicitly states that the presumption of contamination "is rebutted by a defense established as set forth in subsection (a1)" and then proceeds to list four specific, exclusive grounds for rebuttal. N.C.G.S. § 113-421(a)–(a1) (2023).  This structure and phrasing make clear that no

other basis for rebuttal is permitted *beyond* those identified in subsection (a1). Had the legislature intended for the castle doctrine presumption to function in a similar way, it could have used the same or similar language to limit rebuttal to the five circumstances in subsection (c).

Similarly, in N.C.G.S. § 20-305.1, the legislature provides a rebuttable presumption that a dealer's declared retail rate for warranty repairs is reasonable. Subsection (a1) expressly outlines how that presumption may be rebutted:

> The average of the parts markup rate and the average labor rate shall both be presumed to be reasonable, however, a manufacturer or distributor may, not later than 30 days after submission, *rebut that presumption by* reasonably substantiating that the rate is unfair and unreasonable in light of the retail rates charged for parts and labor by all other franchised motor vehicle dealers located in the dealer's relevant market area offering the same line-make vehicles.

N.C.G.S. § 20-305.1(a1) (2023) (emphasis added). This language creates a formal rebuttal mechanism that includes comparative data, timing, and procedural rights, clearly signaling legislative intent to narrowly tailor how the presumption may be overcome. The absence of similar language or structure in N.C.G.S. § 14-51.2(c) indicates that the legislature did not intend to similarly restrict rebuttal of the castle doctrine's presumption.

These examples demonstrate that when the legislature intends to limit a rebuttable presumption to specific, enumerated grounds or to impose structured rebuttal mechanisms, it knows how to do so. The absence of any such language in

the castle doctrine statute indicates that subsection (c) was not intended to serve as the exclusive grounds for rebuttal. Rather, subsection (c) unambiguously provides common circumstances in which the presumption will not apply, without foreclosing the possibility that other facts—such as the intruder's lack of aggression, unarmed status, or physical limitations—may also suffice to rebut the presumption of reasonable fear.

Other jurisdictions interpreting similar statutory castle doctrines reinforce the conclusion that statutory presumptions of reasonableness remain rebuttable through evidence beyond express statutory exceptions. These courts have found that rigidly confining the rebuttable presumption to narrow statutory carveouts contravenes legislative intent, introduces impracticalities, and leads to unjust outcomes. For instance, in *State v. Glenn*, 838 S.E.2d 491 (S.C. 2019), the Supreme Court of South Carolina emphasized that the statutory presumption of reasonable fear—similar to the one in North Carolina's castle doctrine—does not foreclose a court's duty to consider whether a defendant has otherwise established self-defense. *Id.* at 496–98. The statute at issue codified and extended the castle doctrine but still required the trial court to assess whether the defendant actually and reasonably feared harm and acted without other means of avoidance. *See* S.C. Code. Ann. § 16-11-440 ("The presumption [of reasonableness] *does not apply* if the person . . . ." (emphasis added)). The *Glenn* court faulted the trial court for denying immunity based solely on the defendant's technical lack of a "right to be" on the premises, holding that courts must

also consider whether any unlawful activity was proximately related to the use of force. 838 S.E.2d at 497–98. That is, the defendant's alleged trespass did not automatically preclude immunity if it was not the proximate cause of the confrontation. *Id.*

This reasoning reflects an understanding that presumptions of reasonableness cannot be treated as conclusive when contextual facts undermine their foundation. The *Glenn* court explicitly warned against "hyper-technical" readings of such statutes that would lead to absurd results, such as denying immunity to a person attacked while unlawfully present in a location, even if their presence was wholly unrelated to the incident. *Id.* at 497. The court thus rejected a categorical approach and instead adopted a flexible, proximate-cause analysis that allows rebuttal even when not squarely within the statute's enumerated exceptions. *Id.* at 497–98.

Similarly, in *People v. Owen*, 226 Cal. App. 3d 996 (1991), the California Court of Appeal construed section 198.5 of the Penal Code of California—which, like North Carolina's castle doctrine, presumes that a person in their home has a reasonable fear of death or bodily harm when confronting an unlawful intruder. *Id.* at 996. The *Owen* court held that this presumption is rebuttable and clarified that it imposes on the prosecution the burden of disproving reasonable fear beyond a reasonable doubt. *Id.* at 1005–06. But importantly, the court recognized that if evidence in the record undermines the factual basis for the presumption—such as if the defendant used

excessive force or the "intruder" was not clearly threatening—then the presumption may be overcome. *Id*. at 1006–07.

Both *Glenn* and *Owen* demonstrate a consistent judicial recognition that statutory presumptions of reasonableness do not create absolute, irrebuttable shields. Courts must retain discretion to assess reasonableness in light of the entire record. The legislative silence on limiting rebuttal to enumerated exceptions, when paired with these interpretations, supports construing the North Carolina castle doctrine's presumption as rebuttable through general evidence of unreasonableness.

Even if the castle doctrine statute's language *was* ambiguous, canons of statutory interpretation still support the interpretation that the castle doctrine's presumption of reasonableness may be rebutted independently from subsection (c). Contrary to Mr. Allison's arguments, the *in pari materia* canon supports this view. The *in pari materia* canon requires courts to interpret statutes dealing with the same subject matter together and harmoniously, especially when they are enacted as part of the same legislative scheme. *In re R.L.C.*, 361 N.C. 287, 294 (2007). This canon is particularly relevant here because the castle doctrine statute and sections 14-51.3 and 14-51.4 were all enacted simultaneously in Session Law 2011-268. *See* An Act to Provide When a Person May Use Defensive Force and to Amend Various Laws Regarding the Right to Own, Possess, or Carry a Firearm in North Carolina, S.L. 2011-268, § 1, 2011 N.C. Sess. Laws 1002, 1002–04.

Section 14-51.4 further undermines the view that subsection (c) provides the only rebuttal ground for the presumption of reasonableness, because it disqualifies an individual from relying on the justifications in sections 14-51.2 and 14-51.3 if the individual is committing a felony or is the initial aggressor. N.C.G.S. § 14-51.4 (2023). This exclusion applies even though such disqualifying conduct is not listed in subsection 14-51.2(c). The language—"[t]he justification described in G.S. 14-51.2 and G.S. 14-51.3 is not available"—confirms that the justifications under both statutes can be overcome by factual circumstances beyond the scope of subsection (c). *See* N.C.G.S. § 14-51.4.

If, as Mr. Allison contends, the presumption under the castle doctrine could be rebutted only by the five circumstances listed in subsection (c), then section 14-51.4 would be redundant to the extent it bars the presumption based on conduct not found in subsection (c). The legislature's decision to codify these exclusions outside of subsection (c) supports the interpretation that the presumption can be rebutted by circumstances beyond the scope of subsection (c). Elevating the presumption in subsection (c) as irrebuttable would ignore this broader statutory context and violate the *in pari materia* canon.

Accordingly, interpreting the statutes harmoniously supports the conclusion that the five exceptions in subsection (c) are not the exclusive means of rebutting the presumption of reasonable fear. Rather, they are illustrative examples within a

broader framework that permits the introduction of evidence to challenge the presumption, consistent with sections 14-51.3 and 14-51.4.

In sum, the castle doctrine's presumption of reasonable fear may be rebutted by evidence beyond the five exceptions enumerated in the statute and *Phillips* is not controlling because its discussion of subsection (c) of the castle doctrine statute as the exclusive means of rebutting the presumption constitutes nonbinding dicta.

Looking to the evidence below, the trial court did not plainly err in failing to instruct the jury that it was mandatory to presume Mr. Allison satisfied the reasonableness presumption. As stated in the concurrence in *Phillips*, the castle doctrine statute creates a rebuttable presumption of reasonable fear "when the defendant satisfies the specific ... requirements" of N.C.G.S. § 14-51.2(b). *Phillips*, 386 N.C. at 529. It permits defensive force against one who "unlawfully and forcefully enter[s]" a protected space. *Id.* The jury's answer on the issue of whether there was unlawful and forceful entry dictate whether the presumption of reasonable fear attached and whether the castle doctrine applied at all. *Id.* at 531. The State presented sufficient evidence to support the conclusion that Mr. Adams' entry, even if unlawful, was not forceful. The State presented evidence that Mr. Adams was unarmed and no weapons besides Mr. Allison's shotgun were found on the scene. There are conflicting accounts over whether Mr. Adams was being aggressive in the first place. According to Mr. Allison's testimony, Mr. Adams used his hand and foot to stop Mr. Allison from shutting his door, but Mr. Adams did not enter the home or

force entry otherwise. There had been a pushing match between the two in which Mr. Allison claims Mr. Adams had more strength. However, Mr. Allison also testified that Mr. Adams just had neck surgery. Mr. Allison also did not have defensive wounds or injuries. Mr. Allison, determining that Mr. Adams would not leave, immediately grabbed his shotgun and pointed it at Mr. Adams, though the record does not indicate reciprocal aggression on Mr. Adams' part. Mr. Allison counted down several times while pointing the gun at Mr. Adams, which could undermine the imminence of perceived danger. After law enforcement arrived and arrested Mr. Allison, Mr. Allison made comments about not intending to shoot Mr. Adams, which could suggest that it was not Mr. Allison's intent to use the gun for self-defense out of reasonable fear as much as it was to intimidate Mr. Adams. If a person does not "unlawfully and forcefully" enter another's property, the statutory presumption of reasonable fear does not attach. Thus, given the conflicting nature of testimony in this case, it was not mandatory for the jury to presume Mr. Allison satisfied the reasonableness presumption.

Had the jury concluded that entry was "unlawful[ ] and forceful[ ]" as required by subsection 14-51.2(b), then the jurors would be tasked with finding whether the State rebutted the reasonableness presumption. *Phillips*, 386 N.C. at 531. This case presents the rare instances that make the majority's interpretation of the castle doctrine and subsection (c) untenable—even the flimsiest bit of conflicting evidence of a unlawful and forceful entry would permit the use of defensive force and

automatically give the defendant the mandatory presumption of reasonableness that the State cannot rebut unless the five exceptions in subsection (c) apply. Here, the State's evidence undercuts the defendant's assertion that he was under reasonable fear of death or serious bodily harm. On these bases, I would not find plain error on the facts of this case. Accordingly, I would affirm the decision of the Court of Appeals.

Justice EARLS joins in this dissenting opinion.